Argued and submitted February 8, affirmed July 18, petition for review denied
October 18, 2007 (343 Or 363)

In the Matter of
K. S., A. S., B. S., and N. S.,
Minor Children.

STATE ex rel JUVENILE DEPARTMENT
OF KLAMATH COUNTY,
*Respondent,*

*v.*

T. S.,
*Appellant.*

Klamath County Circuit Court
0600288JV1, 0600288JV2, 0600288JV3, 0600288JV4
Petition Number
0600288M; A133851

164 P3d 308

James J. Spindor argued the cause and filed the brief for appellant.

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim and Sercombe,* Judges.

SERCOMBE, J.

* Sercombe, J., *vice* Carson, S. J.

**SERCOMBE, J.**

Mother appeals a judgment extending jurisdiction of the juvenile court over her four children. Mother contends that the state failed to prove that any of the children's "condition or circumstances are such as to endanger the welfare of the person * * *," the statutory basis for jurisdiction alleged in the dependency petition. ORS 419B.100(1)(c). On *de novo* review, ORS 419A.200(6)(b), we find that the Department of Human Services (DHS) presented sufficient evidence to prove that the welfare of the children was endangered by their circumstances. Accordingly, we affirm the judgment.

Mother and father lived together with their four children: K, a 14-year-old girl; and three boys, A, B, and N, ages 11, nine, and five years, respectively. The children recently had been adopted by father. On May 26, 2006, DHS was notified of a concern about sexual abuse of K by father. Tara Westfall, a DHS caseworker, interviewed K, and K disclosed numerous incidents of sexual abuse by father over the past three to four years. Initially, DHS and the parents agreed to place all four children with their maternal grandmother and to prohibit any interaction between the children and father. Later, K complained of pressure from the grandmother to recant the sexual abuse claims. DHS personnel and the parents met on May 31 and agreed on a safety plan. Under the plan, K was placed in foster care. The boys were to stay with mother with "no case discussion," and father would stay with his mother-in-law and have no contact with the children except during visits monitored by DHS.

A dependency petition was filed on June 1, 2006. The petition alleged that the children were under the jurisdiction of the court pursuant to ORS 419B.100(1)(c). Paragraph 8(A)(1) of the petition alleged:

"A.  The children, [K, A, B, and N], are currently residing under a threat of harm for sexual abuse, to wit:

"1.  The father * * * has sexually abused [K] on repeated occasions since the child was approximately 11 years old. The mother * * * does not believe that the sexual abuse has occurred, and does not believe that her husband * * * poses a

threat of harm to her children. This circumstance places all of the children, [K, A, B, and N] under a threat of harm for sexual abuse."

On July 17, mother and DHS agreed to a modification of the safety plan, which continued to prohibit contact between mother and father and continued the restrictions on father's interactions with the children. A shelter hearing was held on July 24. Because the evidence showed that mother continued to be unsupportive of K and was influencing the brothers to resent their sister, the court placed the brothers in foster care.

The jurisdictional hearing occurred on August 30. Only Westfall and mother testified. Westfall testified about her May 26 interview with K, during which K disclosed "numerous incidents of sex abuse." During that interview, K stated to Westfall that she had disclosed the abuse to mother and grandmother when she was 11 years old, but recanted after threats by father. Mother's attorney objected to Westfall's testimony about a conversation with mother. The state's attorney suggested that "it would be appropriate to just proceed at this moment with a prima facie [case] against dad, with mom and her attorney maybe out of the courtroom, and then we could continue with mom afterwards." The court approved the idea, suggesting to mother's attorney that "you may want to just withdraw and not participate * * *." Mother's attorney demurred, stating "we'll stay in the room and listen" but "won't participate in this part." The court ruled that, "at this point in time, we will be going forward on the evidence based only on the prima facie [case] for father."

With that understanding, the examination of Westfall continued. The caseworker detailed K's description of the nature and history of the sexual assaults. K told Westfall about discovering a fictional book written by father, describing in graphic detail a father raping his young daughter and other children. Westfall stated that she had recovered the book and read it; she testified that "a lot of the details in the chapter were similar to some disclosures that [K] had made." Westfall further testified that father had been investigated in California for sexually abusing his 12-year-old

step-daughter in 1994 and his six-year-old biological daughter in 1996. Neither case resulted in a criminal prosecution. Based on that testimony, the court found that "there is a basis for jurisdiction under [paragraph] 8(A)(1) [of the petition] to take jurisdiction over the children and father in this matter." The court allowed that the state's attorney could "still question Ms. Westfall in regard to [mother's] case."

"Mother's case" resumed. Westfall testified that mother was aware of the "prior allegations" from California, but did not believe that father had abused the other children. She also stated that mother was aware of the contents of the book, but was not concerned for the safety of her children. Westfall reported that K was present at a cousin's birthday party, also attended by her brothers, mother, and other relatives. According to K, her brothers were "mean to her, were not wanting to speak with her, they were telling her that they didn't believe her, that she was lying." The oldest brother complained about $10,000 being spent for a lawyer's retainer. That upset K and made her cry. K told Westfall that mother had laughed at her tears. K's recounting of the birthday party episode with her brothers was the catalyst for the July 24 shelter hearing that resulted in different custodial arrangements for the brothers.

Next, Westfall summarized her interview of the brothers. All three were supportive of their parents and felt that K was lying about the sexual abuse. None reported having been sexually abused by father.

Westfall opined that a risk of harm existed for all of the children because mother was unwilling to accept the truth of K's accusations and to take the necessary steps to protect the children from father. There was a risk that mother would allow unsupervised contact between father and the boys and that she "may try to convince the boys that no threat is presented by father, to make them more comfortable in his presence." However, Westfall admitted that mother had agreed to both the May 31 and July 17 safety plans and that there was "no evidence that [mother] ever violated either one of these safety plans."

The state then called mother to testify. Mother confirmed that she was aware of the prior sexual abuse allegations by father's children and did not believe them. Mother had read the book authored by father, but it didn't bother her: "it's like Stephen King, I mean he's not a murderer." Mother claimed that K's sexual abuse claims were made to retaliate against her parents for removing K's concealed boyfriend from their home. Mother stated she heard K say that "she's going to get us back for whatever, for embarrassing her."

Mother admitted that the brothers would be in danger if K were telling the truth. Mother stated that she never asked father if any of the past or current sexual abuse claims were true. Instead, she assumed that the California charges were unfounded because they were investigated as part of the approval of father's adoption of her children. Mother stated that father knew the book "was wrong and he wish[ed] he never wrote it." Mother claimed that she would follow directions from DHS, even if the court did not take jurisdiction over her children, stating "[m]y kids are everything to me, so I'd follow anything they'd tell me to do."

When questioned about one son's claim that his parents were spending $10,000 on an attorney, the following colloquy occurred:

"[CHILDREN'S ATTORNEY]: Okay. And do you know [how] it came about that one of your children stated to [K] that the parent, your parents, his parents had to spend $10,000?

"[MOTHER]: You mean at the [birthday party]?

"[CHILDREN'S ATTORNEY]: Yes.

"[MOTHER]: That's another reason. I was no where, my brother and a friend of mine and came to me and told me she was there, I didn't even know she was there, I left the building. And so I didn't even see them make contact at all.

"[CHILDREN'S ATTORNEY]: Okay, well do you know why he would use that number?

"[MOTHER]: I don't know why he would use that number.

"[CHILDREN'S ATTORNEY]:   I mean was, were you present during any discussion in the house about having to give a lawyer $10,000 because of [K's] accusations?

"[MOTHER]:   We haven't paid $10,000 for an attorney, so I don't know where he would, he might have overheard us talking to, but I don't know where he got the number."

Following the presentation of evidence, the state urged the court to take jurisdiction over all four children because they are "under threat of harm," given the accusations against father and mother's refusal to believe her daughter. The children's attorney argued that mother's indifference to the claims of father's past sexual abuse was a "blind faith [that] poses a danger to these boys * * *." The attorneys discussed whether the court should assert "jurisdiction over the mother." The court ruled:

"[I think] the Court will, on its own motion amend that last sentence [in paragraph 8(A)(1) of the petition] to read, 'under a threat of harm for,' I'm not exactly, I think it's actually mental abuse because what is in front of the Court, the evidence that I have and I will concur with [children's attorney] in regard to mom's testimony about the father, I find it incredulous that a person wouldn't inquire faced with those set of facts. And so I don't find [mother] to be an exceptionally credible witness when it comes to this situation. Especially in regard to her allegations of her daughter lying. It appears to me that she is very protective of her husband and the evidence that I have in front of me in regard to the threat of sex abuse is clear, especially in regard to [K], and I think that that also extends to the boys. However, I think that the boys, my bigger concern is the statements that they have made that are on the record, both from the shelter hearing and today, about how they thought their sister was lying, about how they knew about retainers and lawyers and those type of things. And so the threat of harm for mental abuse or dangers as far as those small boys emotional situation that they're in, is great because it appears that mother has no compunction about talking to other people around the children about this thing, in fact she even said they may have overheard us talking. That was one of the statements that she made on the stand. So she doesn't have any compunction about talking about [K], about talking about [K's] allegations, about talking about sex abuse, about talking about money issues as in regard to [K's] lying,

in front of these boys, because these boys have made statements that they would not know other than the fact that they heard adults talking about it. During the time that they were in the care of their mother."

The court concluded that the jurisdiction over the boys would allow mother and the children to obtain services, because "I think that these little boys have been put in a situation * * * where they're hearing stuff that they ought not hear. And that's putting them at risk for a lot of things, little kids shouldn't have to be privy to * * *." The court directed the filing of an amended petition charging threats of emotional and sexual harm to K and emotional harm to her brothers. Judgment was entered finding that the children were within the jurisdiction of the court as alleged in the modified petition, making the children wards of the court, and committing them to the custody of DHS.

On appeal, mother argues that there was insufficient evidence introduced at the August 30 hearing to allow the court to take jurisdiction over the children under ORS 419B.100(1). ORS 419B.100(1) allows a juvenile court to exercise jurisdiction over a child in a variety of circumstances, including a child "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others." ORS 419B.100(1)(c).

■  The standard for the exercise of jurisdiction under ORS 419B.100(1)(c) was restated in *State ex rel Juv. Dept. v. Vanbuskirk,* 202 Or App 401, 122 P3d 116 (2005):

"The key inquiry in determining whether 'condition or circumstances' warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child. *State ex rel Juv. Dept. v. Smith,* 316 Or 646, 652-53, 853 P2d 282 (1993); *State ex rel DHS v. Kamps,* 189 Or App 207, 213, 74 P3d 1123 (2003). It is the *child's* condition or circumstances that are the focus of the jurisdictional inquiry. In deciding if the juvenile court has jurisdiction, the court must determine if the child needs the court's protection, not the nature or extent of the necessary protection. *See State ex rel Juv. Dept. v. Brammer,* 133 Or App 544, 549 n 5, 892 P2d 720, *rev den,* 321 Or 268 (1995) ('Our decision merely places the children under the protection of the juvenile court. Whether

or not they remain in the home will be determined in a subsequent proceeding.').".

*Id.* at 405 (emphasis in original). The state must prove the facts supporting jurisdiction by a preponderance of the evidence. ORS 419B.310(3); *State ex rel Juv. Dept. v. Froats*, 117 Or App 467, 471, 844 P2d 917 (1992).

■       Mother first claims that the "totality of the circumstances" cannot include evidence presented in father's "prima facie" portion of the hearing on the court's "jurisdiction" over father. Mother asserts that the hearing was bifurcated and that some proof was directed solely against father in order to take jurisdiction over him and cannot be considered in assessing whether her conduct endangers the welfare of her children. Mother implies that, without that proof (greater detail of the claimed sexual abuse of K and father's other two daughters and correlations between the book and K's charges of sexual abuse), the evidence was insufficient to show that the welfare of her children was endangered.

■       The statutes regulating juvenile dependency hearings do not provide for a division of proof in this fashion, separating evidence of a child's welfare from "jurisdictional" evidence of culpable conduct by each parent. The state does not need to discharge an individualized burden of proof for the court to exercise personal jurisdiction over each parent. Instead, personal jurisdiction over a parent is obtained by service of a summons containing a copy of the dependency petition.

ORS 419B.803(1)(a) provides that a juvenile court has jurisdiction over a "party[ ] who has been served in the manner as provided [by statute]." ORS 419B.385(1) further provides:

> "A parent or legal guardian of a ward, if such parent or guardian was served with summons under ORS 419B.812 to 419B.839 prior to the adjudication, is subject to the jurisdiction of the court for purposes of this section. The court may order the parent or guardian to assist the court in any reasonable manner in providing appropriate education or counseling for the ward."

*See also* ORS 419B.875(1)(a)(B) (parties to proceedings in the juvenile court under ORS 419B.100 include the "parents or guardian of the child or ward").

Thus, proof of particular conduct by a parent is not necessary to obtain jurisdiction over that parent in a dependency proceeding. That authority exists when the parent is served with a summons making the parent "subject to the jurisdiction of the court" under ORS 419B.385. It was unnecessary to divide the proof in the proceedings below for that purpose.

All of the evidence in the hearing below is relevant to deciding the "condition or circumstances" of the children under ORS 419B.100(1)(c). We consider the "totality of the circumstances" in assessing whether there is a "reasonable likelihood of harm to the welfare of the child" under *Vanbuskirk*. That consideration is not handicapped by the parties' understandings and use of the extra-statutory process followed below. We therefore reject mother's contention that only part of the record can be considered in evaluating the circumstances of her relationship to the children.

■  The entire record and totality of the circumstances establishes by a preponderance of the evidence that there is a reasonable likelihood of harm to the welfare of K. The duration and type of the sexual abuse of K, the past claims of sexual abuse of father's other children, the similarity of the fictional account in the book to the sexual abuse claims of K, together with evidence of mother's hostility to K and unwillingness to be vigilant in her protection from father, all establish a risk of further sexual abuse, circumstances that endanger the welfare of K under ORS 419B.100(1)(c). Under the totality of the circumstances, the fact that K purportedly failed to report the abuse until she was angry with her parents is not enough to overcome the proof of a reasonable likelihood of harm to K.

Mother next claims that our view of the evidence supporting jurisdiction over K should be constrained by *State ex rel Juv. Dept. v. Boyce,* 47 Or App 759, 615 P2d 385 (1980). *Boyce* concerned the adequacy of an allegation in a dependency petition to state facts sufficient to show jurisdiction over the child. The petition charged that the child "stated that her

father had sexual intercourse with her * * *." It did not aver the truth of the statement, only that the statement was made. We held that the making of the statement alone, short of parental indifference to its utterance, was insufficient to establish the jurisdiction of the juvenile court under an earlier version of ORS 419B.100(1).

The issue here, both in the averments of the petition and in their proof, is different. The issue in this case is whether K was sexually abused by her father, not merely whether K made a statement claiming abuse. As noted above, our review of the record convinces us that abuse was established by the preponderance of the evidence in the jurisdictional hearing. *See State ex rel Juv. Dept. v. Rise,* 54 Or App 725, 729, 635 P2d 1369 (1981) (distinguishing *Boyce* for the same reason). The juvenile court correctly exercised jurisdiction over K under ORS 419B.100(1)(c).

■ The final question is whether the trial court correctly took jurisdiction over the three boys. Mother's core contention is that the evidence is insufficient to establish jurisdiction over her sons, that the state did not establish the necessary "condition or circumstances" under ORS 419B.100(1)(c). Relying on *State ex rel Dept. of Human Services v. Shugars,* 202 Or App 302, 121 P3d 702 (2005), mother argues that proof of sexual abuse of K is insufficient by itself to discharge the burden of showing sufficient "condition or circumstances" with respect to a risk of sexual abuse of K's brothers. In *Shugars,* we held that proof of neglect of the medical needs of a child was not sufficient by itself to justify dependency jurisdiction over all of the children in the home. We also stated that "the 'harm to one child means a risk to the others' axiom is not absolute and immutable. Rather, the application of that principle varies circumstantially." *Id.* at 311. Elaborating further, we noted:

> "The postulate that 'harm to one child presents a risk of similar or related harm to other children in the same household' makes a great deal of sense—common sense—particularly in cases involving sexual or physical abuse. But it is not a universal solvent that automatically justifies the blanket imposition of dependency jurisdiction, without differentiation among the circumstances of each child."

*Id.* at 315; *compare State ex rel Dept. of Human Services v. Kamps,* 189 Or App 207, 214, 74 P3d 1123 (2003) ("A child may be subject to juvenile court jurisdiction if there is evidence of abuse of any child in the child's home.").

Whether harm to one child creates risk to another child depends upon the type of harm as well as the similarity of circumstances between the children. Cases of physical or sexual abuse require little, and many times no, analogue or aggravating circumstances. Thus, in *State ex rel Juv. Dept. v. Brammer,* 133 Or App 544, 892 P2d 720, *rev den,* 321 Or 268 (1995), an extended period of sexual abuse by the mother of her child's eight-year-old friend justified jurisdiction over the child and his two siblings. In *State ex rel Juv. Dept. v. Smith,* 316 Or 646, 853 P2d 282 (1993), a single instance of a father's sexual abuse of his 12-year-old sister-in-law, together with drug use and evidence that father "mentally abused" and "verbally abused" his six-year-old son, was sufficient to establish jurisdiction over the son. Jurisdiction was obtained over an infant daughter because of her father's fondling of an older half-sister and the mother's continued allegiance to father in *State ex rel Juv. Dept. v. Rhoades,* 73 Or App 192, 698 P2d 66, *rev den,* 299 Or 443 (1985). The totality of the circumstances differs in each case. Those precedents are useful in establishing the general principle that it is easy to infer the likelihood of harm to a child by past physical or sexual abuse of other children in the home.

We conclude that the totality of the circumstances shows a reasonable likelihood of harm to the welfare of A, B, and N. In so concluding, we discount the juvenile court's reasoning on the likely "emotional abuse" of A, B, and N. The court, relying on the record "both from the shelter hearing and the [jurisdictional hearing] today," found that mother emotionally abused A, B, and N in discussing, in their presence, the sexual abuse claims, the costs of legal defense, and K's integrity. The court determined that this past abuse created a likelihood of future harm.

We disagree with the court's finding of past "emotional abuse" of A, B, and N for two reasons. First, there is insufficient evidence that mother discussed K's claims within

earshot of her sons. Westfall testified that she had no evidence of any violation of the May 31 safety plan. One of the terms of that plan was "no case discussion." Mother's testimony that A might have overheard a conversation about the case was speculative and unspecific about who might have been conversing. There was no evidence that mother discussed the case in the presence of her sons. Westfall's testimony during the July 24 shelter hearing about mother's denigration of K to her sons was not made part of the record in the jurisdictional hearing. Thus, the relevant record does not support a finding of past "emotional abuse" of A, B, and N by mother.

Instead, the "reasonable likelihood of harm to the welfare" of A, B, and N can be predicted from father's abuse of K, mother's blindness to the welfare of K, and her admission that her sons might be at risk. Mother knew about the past claims of father's sexual abuse of two of his other daughters. She knew about father's writings on child rape. Yet mother was completely hostile to K's claims and unyielding in her allegiance to father. Even more telling, however, mother did not even ask father if K's claims were true. This incuriosity in the face of K's complaint, given the earlier charges of sexual abuse and father's written fantasies on child rape, allows prediction of mother's future inattentiveness to the needs of her children. Mother admitted that, if K's claims were true, her sons would be in danger as well. Given our determination that the proof of K's abuse is sufficient, that admission proves a reasonable likelihood of harm to the welfare of A, B, and N. But, even if K's charges were not true, mother's inaction in failing to even question father in the face of strong evidence of his abusive conduct, given her knowledge that all of her children would be at risk if the claims of abuse were true, shows a past failure to meet the needs of her children. Left unchecked, the continuation of mother's passiveness creates a reasonable likelihood of harm to the welfare of A, B, and N.

Affirmed.