Argued and submitted May 6, reversed and remanded October 28, 2009

In the Matter of D. A. C.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

D. T. C.,
*Appellant.*

Josephine County Circuit Court
040190J; Petition Number 040190J03;
A140588 (Control)

In the Matter of J. C.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

D. T. C.,
*Appellant.*

Josephine County Circuit Court
040191J; Petition Number 040191J03;
A140591

In the Matter of K. M. Y.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

D. T. C.,
*Appellant.*

Josephine County Circuit Court
040192J; Petition Number 040192J03;
A140593

219 P3d 610

Shannon L. Flowers, Deputy Public Defender, argued the cause for appellant. On the brief were Peter Gartlan, Chief Defender, and Holly Telerant, Deputy Public Defender, Appellate Division, Office of Public Defense Services.

Stacey RJ Guise, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

Father appeals a judgment of the juvenile court taking jurisdiction over his three children. He argues that the state failed to prove by a preponderance of the evidence that any of the children's "condition or circumstances are such as to endanger [their] welfare," the statutory basis for jurisdiction alleged in the state's dependency petition. ORS 419B.100(1)(c); ORS 419B.809. On *de novo* review, ORS 419A.200(6)(b), we agree with father that the juvenile court erred in extending jurisdiction. Accordingly, we reverse and remand.

Father and mother have four children together, three of whom—DC, JC, and KMY—are the subject of this appeal. At the time of the hearing, DC was 12 years old, KMY was 11, and JC was 8. Father and mother ended their relationship sometime around 2000, and mother is not involved in this appeal. At the time of the hearing, father had been involved for approximately seven years with his current partner, Tabitha, with whom he lives and has a child, J. J was five years old at the time of the hearing and had never been removed from their care.

Father first came to the attention of the Department of Human Services (DHS) when his and mother's children were removed from mother's care in 2005. DHS placed the children with father in late 2006 or early 2007, despite concerns about father's alcohol use and disciplinary methods. Four months later, however, DHS removed the children from father's care; the record indicates that the reason for removal was father's alcohol use, but there are no further details or information about how that use affected the children. The court assumed jurisdiction over the children in June 2007 and ordered father to participate in a substance abuse assessment and any recommended follow-up treatment, and to complete parenting classes.

Father participated in a substance abuse assessment with Vicky Cooper of OnTrack, Inc., a comprehensive counseling service agency, on May 31, 2007. Cooper diagnosed father with "Alcohol Dependence Provisional," level one. She recommended that father attend three two-hour "Intensive Outpatient Group" treatment sessions at OnTrack

on weekday afternoons; attend monthly one-on-one counseling sessions at OnTrack; attend weekly Alcoholics Anonymous (AA) meetings in the community, verifying his attendance at those meetings with signed slips; and undergo random urinalyses (UAs), for a minimum of 16 weeks. Cooper testified later at the dependency hearing that random UAs were the only way to verify that a person had remained sober and that verification of AA meeting attendance was necessary because, with "drug and alcohol [treatment,] it's all about documentation and paperwork. If it's not on paper it didn't happen, usually." She also explained the difference between treatment and AA:

> "[T]reatment is good for information and having a look at the denial and * * * [to] get the education on alcoholism as a disease * * * [and] what it does to the family systems and what it does to you physically, psychologically. And then AA is a place to learn how to live life now without the alcohol."

Father refused to give a UA at the end of his May 31 assessment, stating that his ride was waiting for him and that he did not have time. In her evaluation, Cooper stated that father presented as "guarded," "grandiose," and as a "victim"; that he possessed poor judgment and poor insight into his disease; that he did not recognize that he had a problem and thus saw no reason to change; and that his risk of relapse was "severe."

One week later, in June 2007, the children told a DHS caseworker that father "ha[d] been drinking heavily to the point where he passes out on the couch on a regular basis and is upset and angry, yells a lot[,] and is not able to parent them." The children also stated that father "acts out" when he is drinking, which frightens them. The caseworker concluded that the children had been "injured emotionally by the things [father] does and says to them."

After attending his first appointment at OnTrack, father never returned and was discharged for noncompliance. According to father, he chose not to participate because he had previously completed an OnTrack treatment program in 2004 after being convicted of driving under the influence of intoxicants (DUII) and felt that he would not receive any benefit from attending again; because the treatment was too

expensive (despite Cooper's assurance that he would not be denied on account of his inability to pay); because he could not get the time off from work (despite his testimony that he was self-employed); and because DHS had lied to him about placing the children with him and had instead decided to place them again with mother.

On July 26, 2007, DHS caseworker Lindorf held a family decision meeting with father, Tabitha, mother, and the children's grandmother. At that time, the children were again transitioning into mother's home. During the meeting, father declined supervised visits with the children, stating that he planned to "just wait DHS out." According to Lindorf, father was "agitated," "on edge," "non-cooperative," and "ended up leaving half way through the meeting."

Lindorf held another meeting in November with mother, father, and Tabitha in an "attempt to bring [father] into the process" and to "engage him * * * in[ ] any kind of * * * treatment." Because it was clear to Lindorf that father was not willing to complete a treatment program, she suggested, as a "last ditch effort," that he attend AA meetings, verifying his attendance at those meetings, "as a gesture that he was trying to comply and work with [her] at all" and so that he could resume visits with the children. At that time, father told Lindorf that he had "been sober for several months, but [that he] didn't have a specific sober date."

That same month, father's oldest daughter, who is not involved in this proceeding, reported to DHS that father had been drinking alcohol on Halloween night. She told DHS that father had grabbed her arm and raised his voice to prevent her from going to a Halloween party of which he did not approve and that he had been "mean and forceful," which, she later testified, typified his behavior when drunk. She also later testified that she had seen father drink a beer that night, that his eyes had been red, that she had smelled alcohol on his breath when he grabbed her, and that, when father drinks, he is generally "edgier," "meaner," and more controlling than usual.

Father successfully completed parenting classes in December 2007. In her "Closing Report," the instructor stated that, although father was "belligerent at first," he was

eventually able to enjoy the course and to employ success-fully some of the techniques he had learned. She noted that father and Tabitha would sometimes bring J with them to class, commenting that

"[father and Tabitha] always made sure [J] would have a positive experience; they would bring snacks for him to eat, coloring books, crayons, blocks, etc. They praised him abun-dantly, listened patiently to his requests, modeled healthy responses and dialogue. [J] was always clean, happy and responsive to his parents."

She further noted that father and Tabitha "spoke lovingly of [father's] older children, missing them, and desiring to par-ent them." She opined that father and Tabitha "can provide a stable and secure home for their children. They are certainly doing so for [J]."

In April 2008, DHS closed father's case.

In August 2008, DHS again removed the children from mother's home. DHS did not place the children with father; instead, it filed a new jurisdiction petition under ORS 419B.809, alleging that the children's "condition or circum-stances are such as to endanger [their] welfare," ORS 419B.100(1)(c), because (1) "father's substance abuse inter-feres with his ability to safely parent" the children; and (2) "despite prior services offered * * * through DHS and other agencies, * * * father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to" the children. The court held a hearing on the petition on October 22 and 24, 2008, as required by ORS 419B.305.

At the hearing, father denied that he had an alcohol problem. Nonetheless, he testified that he had stopped drink-ing approximately one year earlier "for [him]self, for [his] children, [and] to better [his] life"; he further testified that he did not intend to drink again because his 2004 DUII convic-tion had "cost [him] money [and] time" and he didn't "need that kind of stuff in [his] life." He could not remember pre-cisely when he had stopped drinking, but estimated that his last drink had been sometime in the fall of 2007. Father stated that he could not remember the precise date of his last drink because he often went long periods without drinking and because "the exact date" had not "really been that big a

deal for [him]." Tabitha testified that father's last "slip up" drink had been in December 2007, 10 months before the hearing, and that he had been continuously sober since that time.

Father testified that he had understood AA to be an acceptable alternative to treatment based on his November 2007 meeting with Lindorf. He explained that he had preferred AA meetings because they were free and in the evening. He claimed to have had attended AA meetings sporadically "if [he] felt like [he] wanted to" for approximately three or four months, then stopped attending in the spring of 2008 because he thought himself "not [as] bad off as" the other people there and "didn't want to sit there and continually dredge and live it over and over and over." He did not participate in the receiving of sobriety coins commemorating periods of continuous sobriety, because he did not wish to "be reminded of something that's negative in [his] life" and felt that he did not need the group's encouragement. Father never obtained an AA sponsor and was unable to produce any verification of his attendance at AA meetings. Although he recalled having undergone some UAs in the week prior to the hearing, he could not produce the results of those UAs.

Tabitha testified that she does not drink alcohol or use drugs and that she and father "have a sober household" and "sober friends * * * around." She also testified that she supports and encourages father in his sobriety.

At the conclusion of the hearing, the court noted that it was clear that father "loves his children" and that father's completion of the parenting classes shows that he is "willing to do things to try to be * * * their parent." It also acknowledged that the recommended course of treatment conflicted with father's work schedule. Although it found father's testimony "very vague and * * * indefinite," it was nonetheless "reassured" by Tabitha's testimony, which it found credible, that father had been "making a good-faith effort at sobriety on his own." The court stated that father "really is a good candidate for custody for these children."

The court ultimately concluded, however, that the state had proved both allegations in its petition by a preponderance of the evidence. Regarding the second allegation— that, "despite prior services offered * * * through DHS and

other agencies, * * * father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to" the children—the court concluded:

> "And I don't think it's fair, I don't think it's right that if somebody comes into court later and says, 'Despite being ordered to do that, I managed to do the equivalent on my own and therefore we should disregard what this judge has ordered that I should do.' I don't think that's—I don't think I can do that or should do that and I'm not going to do it in this case.
>
> "What I find is that you were ordered to do the evaluation and the treatment and you didn't. And so I do find that by preponderance of the evidence that [the second] allegation has been proven.
>
> "I will say that * * * I don't take lightly what you said about * * * just doing this cold-turkey or doing it on your own. I think to some extent you may have done that. I don't know if you have a raging alcohol problem at this moment. But [it] seems to me * * * that if you would just go do the program, if you really are sober, maintaining your sobriety for 16 weeks * * * [and] doing the classes should be * * * not that hard compared to all the other services that so many people are ordered to do. I mean, other people that come into family court are literally ordered to do three or four different types of things at one time, classes, do this, do that. We're just asking that you do this one thing."

Regarding the first allegation—that "father's substance abuse interferes with his ability to safely parent" the children—the court concluded that, "because [father] had not done the program [of recommended treatment] and then continued to consume alcohol [in October and December 2007,] * * * that allegation has also been proven by a preponderance of the evidence." Accordingly, the court took jurisdiction over the children, and father appeals.

■■    The parties do not dispute the relevant legal principles. The juvenile court "has exclusive original jurisdiction" in any case involving a child "[w]hose condition or circumstances are such as to endanger the welfare of the [child]." ORS 419B.100(1)(c). "Although there is a strong preference that children live in their own homes with their own families, the state recognizes that it is not always possible or in the

best interests of the child or the public for children who have been abused or neglected to be reunited with their parents or guardians." ORS 419B.090(5). "The key inquiry in determining whether 'condition or circumstances' warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *State ex rel Juv. Dept. v. T. S.*, 214 Or App 184, 191, 164 P3d 308, *rev den*, 343 Or 363 (2007) (internal quotation marks omitted). In deciding whether the juvenile court has jurisdiction, "[i]t is the *child's* condition or circumstances that are the focus of the * * * inquiry." *Id.* (internal quotation marks omitted; emphasis in original). The state must prove the facts supporting jurisdiction by a preponderance of the evidence. ORS 419B.310(3); *T. S.*, 214 Or App at 192.

On appeal, as noted, father argues that the evidence presented at the October 2008 hearing did not justify taking jurisdiction. He focuses in particular on the juvenile court's apparent reliance on his refusal to complete the recommended OnTrack program; he argues that, by relying on that failure, the court shifted the inquiry from the children's circumstances to his own condition. Moreover, father maintains that the juvenile court's decision to take jurisdiction stemmed from considerations of fairness to other litigants who had followed the court's recommendations, and that such considerations were not lawful. The state's response does not directly address the role that father's refusal to complete the OnTrack program played in the juvenile court's decision. Rather, it argues that the totality of the evidence was sufficient to show that the children's "condition or circumstances are such as to endanger [their] welfare." ORS 419B.100(1)(c). The state focuses on the following facts in addition to father's refusal to participate in the recommended course of treatment: (1) father denied that he had an alcohol problem; (2) although father claimed to have been sober for approximately one year before the October 2008 hearing, the record demonstrates that he used alcohol in October and December 2007; (3) father failed to provide any verification of his attendance at AA meetings; and (4) father's alcohol use causes him to "act out" toward the children, which scares them. In other words, the state contends that "there is sufficient evidence in the record to establish by a preponderance

of the evidence that father's alcohol dependence and his unwillingness to participate in treatment pose a reasonable likelihood of harm to the children."

■       Although we find this to be a close case, we conclude that the court erred. Father's refusal to participate in treatment is a serious concern, as is his refusal to provide UAs, and we do not mean to downplay the importance or the wisdom of the court's recommendations. Further, we recognize that drinking to excess can be harmful or dangerous to children and that father's continued sobriety is not guaranteed. We are nonetheless persuaded that the state did not produce sufficient evidence in this case. It bears repeating that "[t]he key inquiry * * * is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *T. S.*, 214 Or App at 191. Here, we perceive little if any evidence that father's condition was harmful to the children in the past. From the record, we learn that he "act[ed] out" when he drank, that his conduct when drinking frightened the children, and that drinking made him mean and "controlling." Obviously, that is not ideal parenting. However, without more, it is not inherently or necessarily more harmful or dangerous than other varieties of parenting that would, by no stretch of the imagination, justify state intervention into the parent-child relationship. Passing out is a different matter; had father been the only caregiver in the home when that occurred, we would readily conclude that doing so endangered the welfare of the children. However, at all relevant times, father was living with Tabitha, a nondrinker, and there is no evidence that she was not in the home when father drank himself unconscious.

More importantly, however, even if we were convinced that father's condition *did* endanger the welfare of the children before October 2007, we are not persuaded that, at the time of the hearing, a preponderance of the evidence supported the conclusion that the children were still at risk. "[G]iving considerable weight to the [credibility] findings of the trial judge who * * * observe[d] the witnesses and their demeanor," *State ex rel Juv. Dept. v. Geist*, 310 Or 176, 194, 796 P2d 1193 (1990), we, like the juvenile court, find Tabitha's testimony that father last used alcohol in December 2007, 10 months before the hearing, credible, and

the state does not dispute that evidence. The state's second allegation, that, "despite prior services offered * * * through DHS and other agencies, * * * father has been unable and/or unwilling to overcome the impediments to his ability to provide safe, adequate care to" the children, fares no better. The only evidence presented by the state regarding father's risk of relapse was an OnTrack evaluation, then one and one-half years old, in which Cooper stated that father's risk of relapse at that time had been "severe" due to his denial that he had an alcohol problem and resulting unwillingness to change. But the state has failed to show that any such risk existed when the hearing took place; rather, the undisputed evidence is that father last used alcohol 10 months earlier and had since made the decision not to drink "for [him]self, for [his] children, [and] to better [his] life." Moreover, to the extent that father's parenting when sober was an issue, we find that his successful completion of the parenting program alleviates that concern.

We thus conclude that, under the totality of the circumstances, the state has failed to show a reasonable likelihood of harm to the welfare of the children. As noted above, our focus in determining whether the court's exercise of jurisdiction was proper is on "the *child[ren]'s* condition or circumstances," *T. S.*, 214 Or App at 191 (internal quotation marks omitted; emphasis in original), not on how "fair" the court's decision is to "other people" or on father's obstinacy and failure to comply with specific DHS directives. Because the state has not shown that father was using alcohol at the time of the dependency hearing, nor that he was then at risk of relapsing, nor that a relapse was likely to endanger the children's welfare, it has failed to meet its burden. ORS 419B.100(1)(c). Accordingly, we conclude that the court erred in extending jurisdiction.[1]

Reversed and remanded.

---

[1] Father also argues that the juvenile court erred in its disposition of the case, ORS 419B.325, by placing the children in the legal custody of DHS, ORS 419B.337, and granting guardianship of the children to DHS, ORS 419B.370. Because we conclude that the juvenile court erred in exercising jurisdiction, we need not address father's alternative argument.