Argued and submitted July 2, affirmed November 18, 2009

In the Matter of L. W. and T. J. P.,
Minor Children.

STATE ex rel JUVENILE DEPARTMENT
OF YAMHILL COUNTY,
*Respondent,*

*v.*

N. W.,
*Appellant.*

Petition Number J12807;
Yamhill County Circuit Court
00375678, 00375679;
A141262

221 P3d 174

Mary Shannon Storey, Deputy Public Defender, Legal Services Division, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Michael A. Kakuk, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Jerome Lidz, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

Mother appeals a juvenile court judgment taking dependency jurisdiction over her two children. She argues, first, that the juvenile court erred in denying her motion to dismiss the dependency petition because the allegations that it contained, even if proved, are insufficient to establish jurisdiction; and, second, that, even if those allegations are sufficient, the state failed to prove them by a preponderance of the evidence. We affirm.

Mother has two children, L and T. At the time of the hearing, L was three years old and living with his father; T was one year old and living in nonrelative foster care. Mother ended her relationship with L's father in early 2006; T has no legal father.

Mother has been the subject of seven Department of Human Services (DHS) referrals, four of which were determined to be founded. The first founded referral occurred in 2005. At that time, DHS found that mother had been "actively using marijuana" in the home and that "the home was * * * in [an] unsanitary and unsafe condition[ ] for" L. Mother was subsequently convicted of possession of a controlled substance and endangering the welfare of a minor. After some initial resistance, mother cooperated with DHS. By early 2006, she had completed the recommended parenting program, a 12-step program, and a chemical dependency drug treatment program. She also attended Alcoholic Anonymous (AA) and Narcotics Anonymous (NA) meetings up to three times per week.

The second founded referral occurred in October 2006. DHS determined that Swift, a convicted sex offender and mother's boyfriend at that time, had had contact with L. DHS advised mother, who had been unaware of Swift's history, that Swift was a sex offender and could not, under any circumstances, "be around children." Mother agreed that Swift would no longer have any contact with L.

The third founded referral occurred in September 2007. DHS determined that, despite the warnings, mother had knowingly allowed L and T to be around Swift and another convicted sex offender.

The fourth and final founded referral occurred in August 2008 and led to the dependency proceeding at issue in this appeal. On the afternoon of August 20, mother took T with her on a visit to a friend's apartment. Mother knew that drug users frequented the house, but testified that, when she visited, nobody used drugs. Also according to mother's testimony, she visited because her friend who lived there wanted to see T.

During the visit, Settell, a probation officer, was conducting routine home visits in the neighborhood to check on one of his sex-offender clients. According to Settell, he heard "laughing, giggling[, and] what [he] * * * describe[d] as horseplay" coming from one of the two bedrooms in the apartment. For approximately 45 seconds, he stood and listened outside the bedroom window, which had no screen but was covered by blinds. He knew Swift from earlier encounters (although Swift was not his client at the time) and recognized Swift's voice. Eventually, he reached into the window, lifted the blind, and saw "Swift laying * * *, on his back on the bed holding * * * a small child," later determined to be T. Mother was sitting on the bed with them, and another woman was standing in the doorway. When the other woman saw Settell, she recognized him as a probation officer and cursed at him.

Settell called for backup and then entered the apartment. He detected a "moderate smell or a very mild smell" of marijuana. That odor led him to the apartment's other bedroom. When he entered that second bedroom, he was able to "clearly identif[y]" the "very strong burnt odor" of marijuana. He and other responding officers found marijuana and drug paraphernalia inside. Swift was arrested for violating his probation by coming into contact with a minor and received a 58-day jail sentence for that contact.

Mother insists that the incident with Swift was "totally accidental." By mother's account, she did not know that Swift would be at the apartment that day; she claims that, when her friends invited her to come over, she asked them who would be at the apartment and had been assured that Swift "hadn't been there in a couple of months or so." According to mother, she was outside behind the apartment smoking a cigarette when Swift walked into the apartment

through the open front door and picked up T from his car seat on the floor in the living room, where a friend was watching him, and then took the child into the first bedroom. The friend rushed outside to warn mother, and mother immediately went into the first bedroom to "get [her] baby," telling Swift that "he wasn't suppose[d] to be there * * * and needed to leave." Then, just as Swift "went to hand [T] to [her]," Settell lifted the blinds. Mother also maintains that she did not discover that people were smoking marijuana in the second bedroom until Settell opened that bedroom's door, at which point she smelled the drug for the first time.

A few days after that incident, mother met with Rucker, a DHS social services specialist. At that meeting, mother refused to submit to a urinalysis (UA) and declined to meet with a representative from the DHS Addiction Recovery Team, a support group for parents designed as an adjunct to drug and alcohol treatment, stating that she wanted to speak to an attorney first. After speaking with her attorney sometime in late October or early November 2008, mother signed a release indicating her willingness to submit to random UAs. By the time of the hearing, however, DHS had not asked her to do so.

After completing its assessment, DHS sought temporary custody of the children. Following an initial shelter hearing on August 27, 2008, the juvenile court placed L with his father and T in nonrelative foster care, where they remained at the time of the hearing. DHS then filed a jurisdictional petition under ORS 419B.809, alleging that the children's "condition or circumstances are such as to endanger [their] welfare," ORS 419B.100(1)(c), because mother (1) "has a history of substance abuse"; (2) "has repeatedly allowed convicted and untreated sex offender(s) [to] have contact with her children, despite being advised of the concerns repeatedly by DHS"; and (3) "has refused to submit to a [UA] and has refused to engage in services with DHS to ameliorate the concerns." The court held a hearing on the petition in January 2009, as required by ORS 419B.305.

At that hearing, mother's testimony (in addition to her version of the events leading to DHS intervention) described her then-current living situation. She was living

with her mother, who had completed one substance abuse rehabilitation program and was about to begin another, and her grandfather, a previously registered foster parent. Her only employment was as a part-time caregiver to an elderly neighbor. She did not allow the children to be alone with her mother, and her grandfather had been cautioned to report any appearance by Swift. In the event that the children were released back to her care, she planned either to continue living with her mother and grandfather or to move in with her ex-fiancé, who would pay rent and utilities. According to mother, the ex-fiancé did not drink or use drugs, and never had.

Mother testified that she intended to prevent any substance abuse relapse by going back to AA and NA meetings, although she had stopped attending those meetings approximately six to eight months earlier because she "didn't need them anymore." She stated that she had relapsed once after completing treatment in early 2006 by smoking "two bowls" of marijuana, but that she had gone "straight to AA, NA," attending up to three times per week, and that she had not used nor felt compelled to use drugs since that time.

After the state had presented its case, mother's attorney moved to dismiss the jurisdictional petition on two grounds: first, that the allegations in the petition, even if proven, failed to establish a legal basis for jurisdiction; and, second, that, even if the allegations did establish a legal basis for jurisdiction, the state had failed to prove those allegations by a preponderance of the evidence. The court denied the motion, and, after mother had presented her case, ultimately concluded that the state had proved each allegation in its petition by a preponderance of the evidence:

"I do find * * * that [mother] * * * ha[s] an established history of substance abuse * * *[,] includ[ing] a relapse after completion of the DHS prior involvement. * * *

"I do find that [mother] knowingly took her child to a residence where known drug usage was frequented. * * *

"The marijuana odor was clearly evident at the front door of the apartment when Mr. Settell first opened the front door. And it was even overpowering when he opened the door to the [second] bedroom.

"Mr. Swift was observed holding * * * the child and playing with the child on the bed while [mother] was sitting on the bed making no apparent effort to obtain the child from Mr. Swift until Mr. Settell's presence was seen when he opened the [blind].

"* * * * *

"[Mother] has refused to engage in any services offered by DHS to [e]nsure the safety of the child, and therefore DHS is unable to [e]nsure the safety of the child or protect the child.

"And by [mother's] own actions it appears that she is not concerned with it, overriding the safety of the child contrary to her own personal desires for her freedom of contact of other individuals and association with people that she knows that ha[ve] a drug history.

"[Mother's] history of substance abuse and taking the child to a known place of * * * drug usage and being there while the child was in the presence where drugs were being used has placed the child in danger."

The court expressly found mother's testimony about the events at the apartment "not credible," a finding with which, on *de novo* review, we agree.

■■ On appeal, mother first assigns error to the juvenile court's denial of her motion to dismiss the petition for failure to state facts sufficient to support a finding of jurisdiction. The relevant legal principles are not in dispute. "[T]he juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and * * * [w]hose condition or circumstances are such as to endanger [his or her] welfare * * *." ORS 419B.100(1)(c). To establish jurisdiction on that basis, a party must file a petition in conformance with ORS 419B.809. Among other requirements, that petition "shall * * * [c]ontain the facts that bring the child within the jurisdiction of the court, including sufficient information to put the parties on notice of the issues in the proceeding." ORS 419B.809(4)(b). The court shall then hold a hearing on the petition. ORS 419B.305. After the proponent of the petition has presented evidence, any other party, without waiving the right to offer evidence in the event that the motion is denied, "may move for dismissal of any or all of the

allegations of the petition on the ground that[,] * * * if proven, the allegations do not constitute a legal basis for the relief sought by the petition." ORS 419B.890(1). We review the sufficiency of the allegations in a jurisdictional petition for errors of law. *State ex rel Juv. Dept. v. Froats*, 117 Or App 467, 470, 844 P2d 917 (1992); *accord In re Conner*, 207 Or App 223, 230, 140 P3d 1167 (2006); *see, e.g., State ex rel Juv. Dept. v. Randall*, 96 Or App 673, 773 P2d 1348 (1989).

Mother argues, as she did at the hearing, that the allegations in the petition, even if proven true, individually and collectively fail to establish that the children's welfare was endangered. As noted above, the petition alleged three facts in support of the assertion that the children's "condition or circumstances are such as to endanger [their] welfare," ORS 419B.100(1)(c): first, that "mother * * * has a history of substance abuse"; second, that "[mother] has repeatedly allowed convicted and untreated sex offender(s) [to] have contact with her children, despite being advised of the concerns repeatedly by DHS"; and third, that "[mother] has refused to submit to a [UA] and has refused to engage in services with DHS to ameliorate the concerns." In response, the state argues that those allegations, "taken as a whole, are sufficient to establish jurisdiction"; it contends that "repeated contact with untreated sex offenders does pose a risk of harm to any child" and that, given mother's history of substance abuse, "the fact that mother refused to engage in services with DHS heightened the concern that * * * she would continue to expose the children to drug use and untreated sex offenders."

Mother relies primarily on *Randall*, 96 Or App 673. In that case, this court examined the sufficiency of the allegations in a jurisdictional petition regarding one of the mother's two children under a version of the juvenile code that predated the substantial revisions made to the code in 2001. *Id.* at 675-76. The petition in that case alleged that

"[t]he behavior, condition or circumstances of [the] child is such as to endanger the child's own welfare and the welfare of others by reason of the following facts: The child's mother uses controlled substances. The child's [younger] sibling, [when] born * * *, had controlled substances in her system."

*Id.* at 675 (internal quotation marks omitted). The state argued that it was "apparent that [the] mother's drug use poses a danger to the child's welfare." *Id.* We disagreed and concluded that, "although * * * a parent's use of controlled substances is a proper consideration in determining whether a child should be made a ward of the state, that allegation is insufficient by itself to establish that the child's welfare is endangered." *Id.* We held that "[t]he petition must also include some factual allegation showing how the parent's drug usage endangers the welfare of the child over whom the court is asserting jurisdiction." *Id.* at 675-76.

We find *Randall* to be unpersuasive authority. In that case, the *only* allegation in the petition was that the mother used controlled substances, and we held *only* that the allegation was "insufficient *by itself*" to establish jurisdiction. *Id.* at 675 (emphasis added). Here, the allegations regarding mother's substance abuse are complemented by allegations that she allowed untreated sex offenders to be with T. The two allegations together present a more compelling case than either one alone; the danger that is inherent in contact with untreated sex offenders is heightened by the use of controlled substances. Thus, the controlled substance allegations are "a proper consideration." *Id.*[1]

Next, mother argues that, even if the allegations themselves are sufficient, the court erred in finding that the state proved that the children's "condition or circumstances

---

[1] A puzzling situation could be presented (but is not, in this case) under ORS 419B.890, the statute permitting a parent to move for dismissal, after the state has presented its case, on the ground that the petition does not contain allegations that, "if proven, * * * constitute a legal basis" for establishing jurisdiction. What is the correct outcome on appeal if the appellate court determines (1) that the court erred in allowing the case to continue because the allegations are insufficient, but that (2) the state nonetheless has presented evidence sufficient to establish jurisdiction? The Oregon Rules of Civil Procedure do not apply in juvenile court dependency proceedings, ORS 419B.800(1), and there is no rule of Juvenile Court Dependency Procedure analogous to ORCP 23 B, which states that, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." That divergence suggests a curious result—that is, that a party's failure to allege sufficient facts in a dependency petition might sometimes trump evidence presented at the jurisdictional hearing that a child is endangered, resulting in a remand. Because we conclude in this case that the petition contains sufficient allegations, we need not confront this question—which could, of course, be mooted by appropriate legislation.

are such as to endanger [their] welfare," the statutory basis for jurisdiction alleged. ORS 419B.100(1)(c). The state responds that the evidence was sufficient. We agree with the state for the following reasons.

■   "The key inquiry in determining whether 'condition or circumstances' warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *State ex rel Juv. Dept. v. T. S.*, 214 Or App 184, 191, 164 P3d 308, *rev den*, 343 Or 363 (2007) (internal quotation marks omitted). In deciding whether the juvenile court has jurisdiction, "[i]t is the *child's* condition or circumstances that are the focus of the * * * inquiry." *Id.* (internal quotation marks omitted; emphasis in original). The state must prove the facts supporting jurisdiction by a preponderance of the evidence. ORS 419B.310(3); *T. S.*, 214 Or App at 192.

In this case, we conclude that the evidence presented at the hearing is sufficient to prove that the children's circumstances endangered their welfare. First, we disagree with mother's assertion that the state failed to prove that she "allowed" Swift to contact T at her friend's apartment in August 2008. As noted above, the juvenile court found mother's testimony regarding those events not credible. We agree and defer to that finding of credibility. Accordingly, we conclude, consistently with Settell's testimony, that mother did "allow" Swift to contact T as alleged.

The record thus establishes that mother, who has a history of substance abuse, brought T to a known drug house and, despite a moderate odor of marijuana emanating from the second bedroom into other areas of the apartment, stayed there with him. It also establishes that, despite her knowledge that Swift was a convicted and untreated sex offender who was prohibited by the terms of his probation from coming into contact with children, mother allowed Swift to come into contact with L and T in September 2007 and with T in August 2008. Furthermore, the record establishes that Swift received a 58-day jail sentence for his contact with T.

It is true that, in *State ex rel Dept. of Human Services v. N. S.*, 229 Or App 151, 157-58, 211 P3d 293 (2009), we rejected the state's argument that contact with an untreated

sex offender is *per se* dangerous to children even where the state has not demonstrated a nexus between the sex offense and the supposed harm. This case is distinguishable for several reasons. First, in *N. S.*, there were two bases for our conclusion: the nature of the sex offense was unknown, and the record did not establish that the offender would have contact with the child. *Id.* Here, by contrast, mother's repeated inability or unwillingness to keep Swift away from her children, despite warnings, shows that mother does not acknowledge that contact with an untreated sex offender could present a risk and that Swift probably *would* have continued contact with the children, mother's promises to the contrary notwithstanding. Second, the petition in *N. S.* contained only the single allegation that potential contact with the sex offender created a risk of danger. Here, as we discussed with respect to the drug use, the presence of untreated sex offenders in combination with the use of controlled substances synergistically creates a whole that is more dangerous than the sum of its parts. And third, we can infer from the fact that a court ordered Swift not to contact children that his violation of that order presented a risk of harm to the children that he did contact—L and T. In short, the fact that mother brought her child to an apartment that she knew to be frequented by drug users and remained there with the child despite the fact that drug use was occurring, and, while there, allowed an untreated sex offender to come into contact with the child, establishes that mother is unable or unwilling to protect the children from exposure to dangerous situations. We thus cannot say that the juvenile court erred in its determination that the children's "condition or circumstances are such as to endanger [their] welfare." ORS 419B.100(1)(c).

Affirmed.