Argued and submitted March 11, reversed June 17, 2009

In the Matter of A. H.,
a Minor Child.

STATE ex rel DEPARTMENT OF HUMAN SERVICES,
*Respondent,*

*v.*

N. S.,
*Appellant.*

Washington County Circuit Court
J050522;
Petition Number 01J050522;
A140237

211 P3d 293

Megan L. Jacquot argued the cause and filed the brief for appellant.

Kristen G. Williams, Assistant Attorney General, argued the cause for respondent. With her on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

ORTEGA, J.

ORTEGA, J.

Mother appeals an order establishing a guardianship under ORS 419B.366 for her child. Although father appeared at the guardianship hearing, he and mother are no longer together, and he is not a party to this appeal. Mother contends that the juvenile court erred when it established the guardianship, which was sought because mother's alleged inability to recognize the risk of harm posed by her brother, a convicted sex offender, made it impossible for child to return to mother's care within a reasonable time. On *de novo* review, ORS 419B.200(6)(b), we conclude that there is insufficient evidence that mother's brother poses a risk of harm to child. Accordingly, we reverse.

The Department of Human Services (DHS) first became involved with the family in April 2005 following reports of domestic violence by father. At the time, child was one month old. Mother was offered—but did not follow through with—counseling and domestic violence classes, and the agency closed the file after father moved out of state. Father apparently returned to Oregon soon thereafter, and, when child was six months old, DHS removed her from mother's care due to concern about mother's ability to protect child from father. Child was placed in foster care with relatives, where she has remained since that time.

Throughout mother's involvement with DHS, the primary concern has been mother's inability to recognize and protect child from threats to her safety—initially from father and, later, from mother's brother, a convicted sex offender. Because of its initial concerns about domestic violence, DHS referred mother to classes at the Domestic Violence Resource Center, which mother completed one year after child was placed in foster care. Although the record is unclear as to timing, mother completed a DHS-referred parenting class at LifeWorks Northwest and, later, voluntarily completed an additional parenting class through the Center for Family Success and participated in a seminar on child abuse prevention. Mother has since ended her relationship with father, who currently resides in Arizona.

In late 2006 or early 2007, DHS discovered that, sometime before 2002, mother's brother was convicted of

third-degree sodomy, an offense that involves "deviate sexual intercourse" with a person less than 16 years of age. *See* ORS 163.385(1) (defining the crime of third-degree sodomy). Mother's brother has not completed sex offender treatment. There is no other information in the record regarding the nature of the brother's sex offense.

After learning of DHS's concerns about her brother, mother voluntarily enrolled in a nonoffending parent class through Family Sex Abuse Treatment (FSAT). She completed the program in March 2008. The FSAT providers recommended that mother be part of her brother's treatment in order to help her understand his triggers and "offending cycle." The providers also recommended that mother participate in her brother's formulation of a relapse prevention plan.

Between October 2006 and May 2007, before mother had completed FSAT, the juvenile court repeatedly found that mother was not yet ready to resume caring for child, primarily because she did not recognize that father—and later, her brother—were threats to child. In May 2007, the juvenile court changed child's permanent plan to adoption and ordered DHS to file petitions to terminate the parental rights of both mother and father.

However, by April 2008, DHS had concluded that adoption was no longer an appropriate plan for child and, as a result, the agency moved to dismiss the termination petitions and to implement a guardianship for child. The juvenile court dismissed the termination petitions, found that a safe return to mother was not possible because she did not recognize the threat that her brother posed to child, changed the plan to guardianship, and entered a permanency judgment accordingly. After mother notified the court of her intention to challenge the guardianship, the court scheduled a contested guardianship hearing.

In August 2008, shortly before the September 2008 guardianship hearing, a DHS employee telephoned mother's home to cancel an upcoming visit. A man answered the telephone and identified himself as mother's roommate but, when asked, refused to give his name. Later, when mother was asked about the incident, she denied having a roommate.

She explained that she had asked a friend to fix her air conditioner and speculated that perhaps that friend had answered the telephone. At the guardianship hearing, mother testified that she had spoken with her friend and that he had denied ever answering the telephone. She also stated that she had examined her caller ID and that there was no record that DHS had called her home.

Shortly before the guardianship hearing, mother developed a safety plan with the assistance of her FSAT counselor. The plan specified that mother and child would not have any contact with father unless "approved by DHS and accompanied by proper supervision." The plan further specified that child would not have any contact with mother's brother. Mother secured her brother's agreement with the plan but did not present the plan to DHS before the guardianship hearing. When asked whether she believed that her brother represented a threat to child, mother responded:

> "I don't. He—he is a registered sex offender. I know that. I understand that. As—as far as keeping them apart, as long as he does not come to my home and I don't take her to him and they're not left alone ever—and they're kept, you know, their distance, then as long as they have no contact, you know, whatsoever until she's of—of that age to decide for herself, you know, to do so, then that—I have no concern. He understands that."

Mother reiterated that, because she did not share a home with her brother, she did not consider him to be a threat and that, although she did not believe that her brother would harm child, she would do everything possible to ensure that he did not do so. Nevertheless, mother stated that she planned to maintain a relationship with her brother and that she believed it was appropriate for her to do so as long as child did not have any contact with him.

Although it appears that mother and her brother shared a home as late as April 2007, mother consistently has denied living with him since September 2007. DHS acknowledges that, despite "numerous" home visits, it has found no evidence that mother's brother currently resides in mother's home. However, because of mother's work schedule, DHS has not been able to conduct unannounced home visits.

Mother's brother currently lives half a mile from mother's home. Mother acknowledged that she occasionally receives mail addressed to her brother at her home but testified that he occasionally uses her address as an emergency address. Although mother believed that child could be returned to her care immediately, she also was willing to wait as long as needed to minimize the stress on child.

Noting that it had initially taken jurisdiction over the family because mother's inability to protect child exposed child to unsafe circumstances, the juvenile court found that, at the time of the hearing, mother continued to have difficulty protecting child. The court emphasized that, over the previous three years, mother had participated in a number of services designed to help her realize that father and her brother were a threat to child and that, despite those services, she continued to receive mail addressed to her brother, continued to reside near him, and did not acknowledge him to be a threat. In light of those facts and the unidentified male at mother's residence, the court found that safety concerns persisted and that child could not be safely returned to mother's care within a reasonable time. After finding the other statutory requirements for a guardianship under ORS 419B.366, the court ordered that a guardianship be established for child.

The facts supporting a guardianship must be established by a preponderance of the evidence. ORS 419B.366(2). ORS 419B.366(5) provides:

"If the court has approved a plan of guardianship under ORS 419B.476, the court may grant the motion for guardianship if the court determines, after a hearing, that:

"(a) The ward cannot safely return to a parent within a reasonable time;

"(b) Adoption is not an appropriate plan for the ward;

"(c) The proposed guardian is suitable to meet the needs of the ward and is willing to accept the duties and authority of a guardian; and

"(d) Guardianship is in the ward's best interests. In determining whether guardianship is in the ward's best interests, the court shall consider the ward's wishes."

A reasonable time is "a period of time that is reasonable given a child or ward's emotional and developmental needs and ability to form and maintain lasting attachments." ORS 419A.004(20).

On appeal, mother contends that, in light of her repeated statements that her brother would not have contact with child, DHS failed to show that there was a plausible risk of harm to child if she were returned to mother's care. DHS responds that, despite mother's professed intentions, her testimony that she did not believe that her brother would harm child demonstrated that she was unable to acknowledge the threat that her brother poses. According to DHS, mother's inability to recognize that threat, combined with her brother's proximity to her home, her continued receipt of his mail at her residence, and her stated intention to continue her relationship with her brother, all demonstrate that the safety concerns that brought child into DHS's care have not abated.

We conclude on *de novo* review that the record does not demonstrate that mother's brother presents a safety risk that prevents child's return to mother. The record establishes neither that her brother would have contact with child nor a nexus between the nature of his prior offense and a risk to this particular child. Accordingly, there is no basis for the required finding that child cannot be returned to mother within a reasonable time.

First, the record does not establish that mother's brother would have contact with child. With the exception of DHS's suspicions, there is no evidence that mother's brother resides with her. Indeed, DHS acknowledges that, despite "numerous" home visits, it has found no indication that mother and her brother are living together. Although there is evidence that, one month before the hearing, there was an unknown male (who identified himself as mother's roommate) at the residence, there was no evidence—even accounting for mother's somewhat unsatisfying explanations—that that person was her brother.

Second, the record contains insufficient evidence of a risk to this particular child. When this court previously has confronted the issue of when and whether a sex offender

presents a risk of harm to child, we have required some nexus between the nature of the offender's prior offense and a risk to the child at issue. *See State ex rel Dept. of Human Services v. L. C. J.*, 212 Or App 540, 546, 159 P3d 324 (2007) (evidence that the mother lived with a person who had been adjudicated to be a sex offender based on allegations of victimizing a girl close to the child's age and who was likely to reoffend was sufficient to establish a risk of harm to the child); *cf. State ex rel Dept. of Human Services v. Shugars*, 202 Or App 302, 315, 121 P3d 702 (2005) (acknowledging, in a dependency case, the postulate that "harm to one child presents a risk of similar or related harm to other children in the same household," but noting that the rule did not automatically justify the blanket imposition of dependency jurisdiction without a consideration of each child's circumstances). Here, DHS has provided no evidence of the circumstances of mother's brother's sexual offense other than that it involved a person who was less than 16 years old and that it occurred some time before 2002. Rather, DHS's position appears to be that, because mother's brother is an untreated sex offender, he necessarily presents a safety risk to child.

This court previously has rejected similar arguments. In *State ex rel SOSCF v. Burke*, 164 Or App 178, 181-84, 188, 990 P2d 922 (1999), *rev den*, 330 Or 138 (2000), a termination case, we declined to infer, in the absence of any evidence that the father had ever victimized his toddler children, that he presented a risk to the children, despite evidence that, before their birth, he had engaged in numerous incidents of sexual contact with teenage females. *See also State ex rel Juv. Dept. v. K. D.*, 228 Or App 506, 516 n 4, 209 P3d 810 (2009) (noting that a father's 13-year-old conviction for the statutory rape of two girls, aged 13 and 14, "does not necessarily demonstrate a propensity * * * to be a threat to his toddler son"). Consistently with those cases, we decline to infer, without other evidence, that, because mother's brother is an untreated sex offender, he is a threat to child, even if he resides near mother's home. Because DHS presented insufficient evidence at the guardianship hearing to demonstrate that mother's brother presented a risk to child that prevented

child's safe return to mother, the juvenile court erred in establishing the guardianship.[1]

     Reversed.

---

[1] Acting on DHS's motion, the juvenile court limited the scope of the evidence below to events that occurred after the April 2008 permanency hearing. The court reasoned that, at the April hearing, it had determined that child could not be returned to mother within a reasonable time, one of the requirements for an ORS 419B.366 guardianship. The court announced that "the information that was adduced" at the earlier hearing would be "incorporated" into the guardianship proceeding, that it "formally adopt[ed]" that information, and that its April 2008 permanency judgment reflected—and it had "a recollection of reviewing"—various documents, including a DHS letter and court report, notes from mother's FSAT participation, an evaluation from child's therapist, and various visitation notes.

With the exception of the DHS letter and a court report (the latter of which appears to be an updated version of a report that was presented to the court in April), none of the documents mentioned by the court was entered into evidence, and they do not otherwise appear in the trial court file. Accordingly, they are not part of the record on appeal. *See State ex rel DHS v. Lewis*, 193 Or App 264, 270, 89 P3d 1219 (2004). Although it is well established that courts may take judicial notice of records and prior proceedings in the same case, *Oden v. Oden*, 157 Or 73, 76, 69 P2d 967 (1937), we do not interpret the juvenile court's vague statement that the information "adduced" at the April hearing was "incorporated" into the guardianship proceeding as taking judicial notice of that information.