Argued and submitted July 20, affirmed November 2, 2011, petition for review
denied February 16, 2012 (351 Or 586)

In the Matter of
A. H., a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

N. S.,
*Appellant.*

Washington County Circuit Court
J050522;
Petition Number 01J050522;
A147443

265 P3d 792

Megan L. Jacquot argued the cause and filed the brief for appellant.

Laura S. Anderson argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Inge D. Wells, Senior Assistant Attorney General.

Before Ortega, Presiding Judge, and Duncan, Judge, and Rosenblum, Senior Judge.

ORTEGA, P. J.

**ORTEGA, P. J.**

In this dependency proceeding, mother appeals from a judgment that changed the permanency plan for child from reunification to guardianship. In a previous appeal involving mother and child, we reversed a judgment that established child's maternal aunt and uncle as guardians. *State ex rel Dept. of Human Services v. N. S.*, 229 Or App 151, 211 P3d 293 (2009) (*N. S.-1*). The order establishing a guardianship in that case was based on the juvenile court's determination that mother was unable to recognize the risk of harm to child posed by her brother, a convicted and untreated sex offender, making it impossible for child to return to mother's care within a reasonable time. On *de novo* review, we reversed that ruling because the record lacked evidence demonstrating that her brother posed a risk of harm to child that would preclude child's safe return to mother's home in a reasonable time. After the appellate judgment issued in that proceeding, the juvenile court changed the permanency plan to "return to parent"—but, several months later, the Department of Human Services (DHS) sought to change the plan back to guardianship.

Over the course of several months, the court held a contested permanency hearing, ultimately approved the change in permanency plan, and again entered an order of guardianship. Mother appeals from the judgment changing the permanency plan to guardianship[1] and advances two arguments: first, that DHS failed to make reasonable efforts to reunify her with child and, second, that she made sufficient progress to make it possible for child to safely return home. *See* ORS 419B.476(2)(a). DHS responds that, despite reasonable efforts by DHS and mother's completion of the services offered to her, mother has nevertheless failed to make sufficient progress because she does not demonstrate understanding of the importance of protecting child from unsafe individuals and because mother's parenting skills have not improved. We agree with DHS and affirm.

---

[1] Mother did not appeal from the order establishing the guardianship, unlike in *N. S.-1*, and, accordingly, that order is not at issue in this appeal.

## I.  STANDARD OF REVIEW

Before we turn to the facts of this case, we must identify the appropriate standard of review. We no longer review all juvenile cases *de novo*; rather, other than proceedings for termination of parental rights, the exercise of *de novo* review is within our sole discretion. ORS 19.415(3). If an appellant requests *de novo* review, she must include a concise statement in the opening brief explaining why we should do so. ORAP 5.40(8)(a), (b). However, such requests are disfavored and there is a presumption against the exercise of *de novo* review; we review only "exceptional cases" *de novo*. ORAP 5.40(8)(c).

Here, mother urges us to treat this as such an exceptional case, contending, among other things, that such review is appropriate because the challenged judgment "effectively operates to sever the relationship between [m]other and child[,]" much like in a termination of parental rights case. Guided by the nonexclusive list of factors stated in ORAP 5.40(8)(d), we decline to exercise *de novo* review in this case. We begin by noting that mother fails to adequately explain how the judgment "effectively terminates" the relationship between her and child given that the guardianship was established under ORS 419B.366 (setting forth the process for establishing "durable" guardianships) and not ORS 419B.365 (permanent guardianships), and the guardianship order allows for contact between mother and child at the discretion of child's guardians. *See also* ORS 419B.368 (establishing grounds for modification or vacation of a guardianship). Moreover, and in all events, the legislature explicitly chose to continue to require *de novo* review in termination of parental rights cases but did not do so for the type of judgment challenged by mother here; given that, we are disinclined to make a different decision. Finally, the trial court made express and detailed factual findings, which counsels against the exercise of *de novo* review. *See* ORAP 5.40(8)(d)(i).

Accordingly, we review the juvenile court's legal conclusions for errors of law but are bound by its findings of historical fact if there is any evidence in the record to support them. *Dept. of Human Services v. C. Z.*, 236 Or App 436, 442,

236 P3d 791 (2010). "Where findings on disputed issues of fact are not made but there is evidence supporting more than one possible factual conclusion, we presume that the juvenile court decided the facts consistently with its ultimate legal conclusion." *Id.* Ultimately, we review the facts found by the juvenile court to determine whether they are supported by any evidence and then to determine if, as a matter of law, those facts provide a basis for the juvenile court's change of the permanency plan from reunification to guardianship under ORS 419B.476. *Id.*

## II. BACKGROUND FACTS

The following facts are taken from the juvenile court's findings, as supported by evidence in the record, and supplemented with procedural or undisputed facts as needed.

DHS originally became involved with the family in 2005 after an incident of domestic violence by father reportedly occurred in the presence of child, who was then one month old.[2] DHS offered services to mother, but she did not follow through with the individual counseling and domestic violence classes that were offered at that time. Shortly thereafter, father moved out of the state and the case was closed. Father returned a couple of months later, and DHS removed child from the home because of concerns about mother's ability to protect her from father.[3] DHS placed child—then six months old—in foster care with her maternal aunt and uncle and she has remained in their care for the intervening six years. Mother's relationship with father continued into 2006, but mother eventually broke it off.

In 2006, mother began supervised visits with child and those visits have continued since that time. In 2007, the weekly visits were expanded to two hours each. However, in late 2006 or early 2007, DHS learned that mother had a close and continuing relationship with her brother, who had been

---

[2] Father's participation in the underlying proceedings was minimal, and he is not a party to this appeal.

[3] Father exhibited signs of suicidal ideation, substance abuse, and mental health issues. Mother, despite recognizing those issues, intended to allow father to take child out-of-state for an unsupervised trip.

convicted of third-degree sodomy in 1997 but had not completed sex offender treatment. DHS was concerned that mother would allow child to be around her brother and that he presented a significant risk to child.

Mother enrolled in and completed a family sex abuse treatment program, which was designed to help parents gain insight into the risks to children posed by unsafe relationships. The provider of that program recommended that mother be involved with her brother's treatment program to help her gain an understanding of his triggers and "offending cycle" and that mother and her brother formulate a relapse prevention plan. However, mother and her brother did not complete the relapse prevention plan, and he did not complete his treatment program.

DHS petitioned to terminate mother's parental rights in August 2007 but withdrew that petition the following April, as the agency no longer sought to pursue an adoption for child. In the meantime, during an unannounced visit to mother's home in early 2008, DHS observed evidence that the brother had been residing in mother's home. DHS referred mother to parenting classes and "in-home Family Skill Builders counseling."

On the same day that the juvenile court dismissed the petition to terminate mother's parental rights, it approved a permanency plan of guardianship pursuant to ORS 419B.476. The court set a contested guardianship hearing and ultimately entered an order establishing a guardianship. The juvenile court found that, "at the time of the hearing, mother continued to have difficulty protecting child." In *N. S.-1*, we summarized the court's findings this way:

> "The court emphasized that, over the previous three years, mother had participated in a number of services designed to help her realize that father and her brother were a threat to child and that, despite those services, she continued to receive mail addressed to her brother, continued to reside near him, and did not acknowledge him to be a threat. In light of those facts and [an] unidentified male [answering the phone] at mother's residence, the court found that

safety concerns persisted and that child could not be safely returned to mother's care within a reasonable time."

229 Or App at 156.

Mother appealed the resulting order establishing a guardianship, and, on *de novo* review, we reversed, concluding that there was no basis for the required finding that child could not be returned to mother within a reasonable time. In particular, we determined that the record failed to establish that her brother would have contact with child because there was no evidence that they were living in the same house. *Id.* at 157. Further, we concluded that the record contained insufficient evidence of a specific risk to child in the absence of evidence regarding the nature of the brother's sex offense. Without any such evidence, we declined to infer from the mere fact that the brother was an untreated sex offender that he was a threat to child in this case. *Id.* at 158.

During the pendency of the appeal, the guardianship remained in place and mother's contact with child was controlled by the guardians. She continued to visit with child and attended other family events when invited but did not initiate phone visits or ask to participate in family events. Mother completed parenting classes, "healthy relationships" classes, and family sexual abuse training classes in 2008. She also began a relationship with Rogers, who was still her boyfriend at the time of the permanency hearing at issue in this appeal and who had incidents and criminal behavior related to alcohol use in his past.

After the appellate judgment issued in August 2009 and the juvenile court vacated the order of guardianship, the court recommended that DHS develop a plan for mother to have expanded visits with child and changed the permanency plan to reunification. However, in September 2009, the brother was arrested at mother's house for failure to register as a sex offender. The police were informed that he had not lived at the address at which he was registered for several months. That address was also the home of Rogers—yet mother had informed DHS that the brother "lived with his mother." When contacted, the brother told the police that he stayed at mother's house on Tuesdays and Wednesdays,

although he was found there by police on a Thursday. Further, the brother told police that if he registered at mother's house, he could jeopardize mother's ability to regain custody of child. Notably, the brother was again arrested at mother's house for failure to register in April 2010.

At a permanency hearing in October 2009, the juvenile court found that mother had made minimally sufficient progress on the reunification plan and approved supervised community visits involving the Center for Family Services (CFS). DHS and mother entered into an agreement providing for "parent child interaction" at the Kinship House, updated psychological evaluations for mother and child, a "Healthy Relationship Class" for mother and her boyfriend, and DHS-supervised visits, as well as community visits supervised by CFS. DHS was also preparing for unsupervised contact between mother and child until it learned that the brother was registered to live at Rogers's home. Concerned that mother had not been fully truthful about her brother's living situation, DHS backed off plans to expand visitation.[4] Ultimately DHS again sought a plan of guardianship for child.

From April through November 2010, the court heard nine days of testimony for the permanency hearing that is at issue in this case. At the conclusion of the hearing in November, the juvenile court issued extensive findings and a judgment, concluding that child could not be safely returned to mother within a reasonable period of time because, despite participation in extensive services, mother had "not gained insight or developed a protective capacity to address the risks posed by return of the child to her care[.]" In particular, the court noted that mother's testimony at the permanency hearing was not credible, specifically as to whether mother would follow an appropriate safety plan if child were returned to her care. The court found that mother lacked transparency, candor, and sincerity throughout the proceedings and, thus, did not give much credence to her testimony that she would provide a safe home for child. The court also found that mother had failed to establish appropriate boundaries with father,

---

[4] DHS did not learn until later that the brother had been arrested at mother's home.

brother, and her current boyfriend, Rogers, despite indications that each of them presented a risk to child's safety, and that mother had prioritized those relationships over ensuring child's safety.

## III.   ANALYSIS

Mother appeals only from the permanency judgment changing the permanency plan from reunification to guardianship because, despite DHS's reasonable efforts, mother had not made sufficient progress to allow child to return home. ORS 419B.476(2)(a) provides that, at the permanency hearing, the juvenile court's role is as follows:

> "If the case plan at the time of the hearing is to reunify the family, determine whether [DHS] has made reasonable efforts * * * to make it possible for the ward to safely return home and whether the parent has made sufficient progress to make it possible for the ward to safely return home. In making its determination, the court shall consider the ward's health and safety the paramount concerns."

On appeal, mother challenges two of the juvenile court's determinations. First, mother argues that DHS failed to make reasonable efforts to reunite her with child. Mother appears to limit her argument to the services offered since the time that the appellate judgment issued in *N. S.-1.* According to mother, DHS "sought only to have mother participate in an updated psychological [evaluation] and visitation, as well as classes she had already completed to the satisfaction of the service providers." Second, mother contends that the juvenile court incorrectly determined that mother had not made sufficient progress to allow child to safely return home within a reasonable time. She asserts that, despite her prior shortcomings as a parent, she has participated in a myriad of services offered by DHS and has made appropriate changes in her life such that child can be transitioned to her home within six months.

We begin by reviewing the juvenile court's determination that DHS made reasonable efforts to make it possible for child to safely return home to mother's care. The particular circumstances of each case dictate the "type and sufficiency of efforts that the state is required to make and whether the types of actions it requires parents to make are

reasonable * * *." *State ex rel SOSCF v. Frazier*, 152 Or App 568, 582, 955 P2d 272, *rev den*, 327 Or 305 (1998). "We also consider whether a parent has attempted to make appropriate changes and whether he or she ignored or refused to participate in plans as required by the state." *State ex rel Dept. of Human Services v. H. S. C.*, 218 Or App 415, 423, 180 P3d 39 (2008).

We agree with the juvenile court that, in the context of this case, DHS's efforts were reasonable. The primary concern throughout this case has been mother's "inability to recognize and implement protective actions to protect child from threats to the child's safety" from the men in mother's life. In line with those concerns, DHS referred mother to individual counseling, psychological evaluations, and classes related to parenting, domestic violence, family sexual abuse, and healthy relationships. DHS also facilitated supervised visits between mother and child.

Even if we only consider DHS's efforts during the period after the original guardianship order was vacated, we conclude that those efforts were reasonable. Since late 2009, DHS has completed a home visit to mother's residence, provided bus passes to mother to facilitate visits, offered expanded community visits, referred mother and child for updated psychological evaluations, and referred mother to a program for parent-child counseling.

Some of DHS's efforts were hampered by mother's conduct. The revelation that mother was untruthful about her brother's living arrangements and the fact that her brother was arrested at mother's home for failure to register as a sex offender understandably led DHS to proceed more cautiously in expanding visits. In addition, an incident at CFS between mother and child led to additional delays in some services while DHS investigated. DHS's response to each of those incidents was reasonable. Additionally, mother refused to engage in some of the services offered by DHS during this time period, including a healthy relationships class and a family sexual abuse training class, because she felt that they were unnecessary.

We are satisfied that the record supports the juvenile court's determination that DHS's efforts were reasonable. Accordingly, we proceed to review its determination that mother had not made sufficient progress to make it possible for child to safely return to mother's home.

As we have previously explained, a parent's "[m]ere participation in services * * * is not sufficient to establish adequate progress toward reunification." *State ex rel Dept. of Human Services v. S. L.*, 211 Or App 362, 372, 155 P3d 73 (2007). Rather, ORS 419B.476(2)(a) requires us to focus on the child's health and safety.

The juvenile court's determination that child could not safely return to mother's home within a reasonable time had two main components. First, notwithstanding having participated in extensive services, the court found that mother continued to conduct her relationships with unsafe males (father, brother, and boyfriend) without due regard for child's safety. In particular, the juvenile court pointed to mother's continued relationship with her brother, an untreated sex offender, as well as her relationship with her boyfriend, who has a history of alcohol-related arrests and a prior restraining order for domestic violence. Second, despite participating in services for years, the court found that mother's relationship with child has not improved and her parenting abilities have not evolved, with the result that mother and child have a weak attachment, mother is unable to independently parent, and a change in child's placement would cause a regression in child's behavior and emotional functioning. Those factual findings, as supported by evidence in the record, provide a sufficient basis for the court's determination that mother has not made sufficient progress to enable child's safe return home.

We begin, as did the juvenile court, with the risks to which mother continues to expose child in her relationships with her brother and her boyfriend. At the permanency hearing, DHS established that the brother was convicted in 1997 of third-degree sodomy involving the 14-year-old son of the brother's friend. Evidence supports the court's finding that the brother, while intoxicated and under the influence of cocaine, used a key given to him by the victim's father—who

was the brother's close friend—to enter the victim's house at 1:00 a.m. and sodomize the victim while he was sleeping. When the victim awoke, the brother fled the household leaving behind a diving knife with a 6-inch blade.

At the hearing, mother introduced a psychosexual evaluation of her brother that placed him at low risk to reoffend. The examining doctor acknowledged, however, that his report relied heavily on the brother's self-reported information. The doctor also acknowledged that substance abuse is the primary issue in the brother's life and that the brother's continued abuse of alcohol would place him at a significant risk to reoffend.

The juvenile court's finding that brother continues to be a risk is supported by evidence in the record. That evidence establishes that the brother continues to abuse alcohol, an identified trigger for his potential recidivism; and that he has unfettered access to mother's home. Further, since 2009, the brother has been arrested twice at mother's residence for failure to register as a sex offender, an apparently deliberate failure given his statement to police indicating his awareness that registering mother's home as his address would jeopardize her case for obtaining child's return. Additionally, although mother continually informed DHS that her brother did not live with her, unannounced visits by DHS revealed evidence that he did, including the evidence that the brother was observed by DHS investigators accessing mother's apartment on several occasions in 2010 with his own set of keys. Moreover, the court found and the evidence supports that, mother has continually been evasive about brother's living arrangements. Taken together, the brother's failure to complete sex offender treatment, his continued and untreated abuse of alcohol, and his unfettered access to mother's home provide enough of a link from his current circumstances to his past sex offense to establish a potential risk to child.

While that risk may be manageable, the record supports the juvenile court's determination that mother has not shown sufficient progress toward recognizing or addressing that risk. Instead, despite DHS's stated concerns, mother has continually refused to acknowledge that her brother poses a

threat to child, and the juvenile court found that her assertions that she would implement any type of safety plan to keep her brother from unsupervised contact with child were not believable. Indeed, despite her previous recognition that sharing a residence with her brother could jeopardize her ability to have child returned to her care, mother continued to allow her brother access to her home and then lied about it to DHS. The juvenile court found that the safety plan that mother did develop was "rudimentary," which was of particular concern given that mother has completed family sexual abuse safety training. Further, given mother's lack of credibility, the court did not believe that she would implement even an inadequate plan.

The evidence supports the court's findings that mother has prioritized her relationship with her brother ahead of child's need for safety and that the brother poses a risk to child. We are likewise satisfied that the record supports the trial court's finding that mother has similarly minimized the risk posed to child by Rogers's alcohol use and criminal behavior.

We proceed to address the court's concern regarding the risks that a return to mother's care would pose to child. The court noted that child has developed a primary attachment with her guardians, that removal of child from those "psychological parents" would damage child, and that child is in need of a permanent home and a "safe parent capable of meeting the evolving needs of * * * child as she ages." Child was placed in the care of her guardians six years ago, when she was six months old. Expert testimony at the permanency hearing established that child is bonded to them; she identifies them as her parents and their home as her home. Child has generally developed normally and exhibits no significant behavioral or emotional problems. Although child generally enjoys visits with mother, her attachment to mother is relatively weak. Expert testimony indicated that child's removal from guardians would result in anxiety, regression, and difficulties forming a secure attachment.

Finally, the court found that mother's parenting skills failed to improve despite the classes and services in which she has participated. The court identified mother's

continuing problems with setting boundaries and limits, her inability to "move the visits forward constructively," child's disrespectful behavior toward mother, and mother's inability "to initiate independent parenting strategies." Although the record contains opinion evidence that mother made progress in developing her parenting skills, the court noted that that testimony was at least in part based on information provided by mother. The court, explicitly in some instances and implicitly in others, found that because mother lacked credibility, the positive reports that depended on mother's self-reported information were less reliable. In sum, the evidence supported the court's determination that mother's parenting skills have not evolved sufficiently to enable child's safe return.

The juvenile court's findings as to the brother's and Rogers's continued risk to child, mother's inability to appreciate both general and specific risks to child, mother's lack of progress in developing parenting skills, and the likelihood that child would suffer if removed from the care of her guardians are supported by the evidence; as a matter of law, those facts provide a basis for the court's determination that mother failed to make sufficient progress to allow child to safely return home.

Affirmed.