Argued and submitted November 29, 2012, reversed February 21, 2013

In the Matter of M. S. and M. S.,
Children.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

M. E.,
*Appellant.*

Washington County Circuit Court
J110095, J110096;
Petition Number 01J110095M;
A150359

297 P3d 17

Megan L. Jacquot argued the cause and filed the brief for appellant.

Justice J. Rillera, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Duncan, Judge, and Brewer, Judge pro tempore.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Mother appeals a judgment of jurisdiction as to two of her children, MA and MI, twin girls who were 13 years old at the time of the jurisdictional hearing.[1] The juvenile court found that mother's current husband—the girls' stepfather[2]—had, on one occasion approximately four years before the hearing, sexually abused MI; that mother did not believe that the incident occurred; and, therefore, that the children were at risk of harm sufficient to warrant juvenile court jurisdiction under ORS 419B.100(1)(c). The court also determined that mother's "negative comments" to one of the twins, MA, created a risk of injury to her emotional and physical well-being. On appeal, mother contends that the trial court erred in concluding that the children were presently endangered, a necessary predicate for jurisdiction under ORS 419B.100(1)(c), "based upon one incident of inappropriate touching four years before the trial," given that stepfather was assessed not to be a risk to children. She also contends that the court erred in concluding that mother's comments to MA "amount[ed] to such harm that the child was endangered."

In dependency cases such as this one, we have discretion to "try the cause anew upon the record or make one or more factual findings anew upon the record." ORS 19.415(3)(b). We exercise that discretion sparingly, *see* ORAP 5.40(8)(c) (appellate court exercises its discretion under ORS 19.415(3)(b) only in "exceptional cases"), and, typically, in

[1] Because wardship over the children has since been dismissed, mother does not seek reversal of the dispositional order encompassed in the judgment. However, as the Appellate Commissioner ruled on August 1, 2012—and the state does not now challenge—mother's appeal of the jurisdictional judgment itself is *not* moot. *See Dept. of Human Services v. G. D. W.*, 353 Or 25, 32, 292 P3d 548 (2012) (petition for review of jurisdictional judgment finding that the father had sexually abused his daughter not moot, because it would have a "practical effect on father's rights and prospects," including the state's ability in the future to more easily terminate the father's parental rights, the father's ability to challenge a subsequent adverse custody and parenting-time judgment, and the social stigma connected with a finding of sexual abuse); *State v. S. T. S.*, 236 Or App 646, 654, 238 P3d 53 (2010) (holding that "stigma" of jurisdictional judgment, together with "taint" on parent's record with the Department of Human Services, is a collateral consequence that renders the dispute justiciable).

[2] In this opinion, we refer to the twins' biological father as "father" and to mother's husband as "stepfather"; neither father nor stepfather is a party to this appeal.

the absence of a request from a party concisely stating why *de novo* review is appropriate, we would not choose to do so. ORAP 5.40(8)(a), (b). However, in this case, although mother does not ask us to apply the *de novo* standard, she does challenge one of the crucial findings underlying the juvenile court's judgment—namely, that a psychosexual evaluation of stepfather indicated that he did not present a risk of harm to only his *biological* children. As explained below, 255 Or App at 308, we agree with mother that the court's finding does not comport with the uncontroverted evidence in the record, and, because that finding is essential to the court's ultimate conclusion that MA and MI are presently endangered, we exercise our discretion to review the facts *de novo.* ORAP 5.40(8)(d)(ii); *Dept. of Human Services v. B. B.*, 248 Or App 715, 718, 274 P3d 242 *adh'd to on recons*, 250 Or App 566, 281 P3d 653 (2012); *Cf. Hanscam and Hanscam*, 247 Or App 207, 219, 268 P3d 715 (2011). Considering the totality of the circumstances—including, particularly, our finding on *de novo* review that stepfather was assessed not to present a risk of harm to *any* child, as well as the express and implied findings of the juvenile court that are supported by the record—we conclude that the twins' "condition or circumstances" are not "such as to endanger [their] welfare." ORS 419B.100(1)(c).

MA and MI were born in 1998. Mother and father divorced in 2000. In 2004, mother married stepfather; they have four children together. Father also remarried; he has no children with his current wife. At the time of the events that gave rise to the jurisdictional judgment, father and mother shared custody of MA and MI; father had them 60 percent of the time and mother had them the remaining 40 percent.

In February 2011, when MA and MI were in the seventh grade, the school scheduled a meeting with mother and father to discuss concerns about MA—in particular, MA had fabricated a detailed story to her teacher that she had bone cancer. The meeting included MA's teacher, her school counselor, and the vice principal; MA was brought in at the end of the meeting. When the counselor told MA about the upcoming meeting, MA admitted that she had lied

about having cancer; she also told the counselor that she was "scratching" her arm and leg and was not eating lunch. According to the counselor, MA felt that mother did not like her and treated her differently from MI. MA then told the counselor about a disclosure that MI had made about stepfather—specifically, MI had told MA that stepfather had touched her inappropriately when MI and MA were in the fourth or fifth grade. At the meeting, mother and father were told about that disclosure. Father "kind of fell apart" and was supportive of MA; mother said that it was a lie and told MA that she would be in trouble if she was telling lies. The meeting was on a Friday; MA and MI spent the following weekend with father, as scheduled.

Father separately talked to both girls about the abuse allegation and, on Monday morning, reported it to the Department of Human Services (DHS), who began an investigation. A DHS caseworker and an officer from the Hillsboro Police Department went to talk to mother. Mother told them that she thought the allegation about stepfather was false. But, she agreed that MA and MI would stay with father and that stepfather would move out of the home and have no contact with any of the children until the investigation was completed. The caseworker described mother as "cautiously cooperative." Mother then remained in the home with the other four children and had only supervised visits with MA and MI. Mother requested counseling for MA and MI as soon as she learned of the disclosures.

Later that week, MA and MI were evaluated at CARES Northwest (CARES), which provides medical assessments for concerns related to child abuse and neglect. MA told the CARES examiner and interviewer what she had disclosed to her teacher—that MI had told her about an incident that occurred when they were in approximately the fourth or fifth grade when stepfather was rubbing MI's back as they were watching television together and then he touched her on her front private area. MA also acknowledged that she had recently been cutting her arm and leg with an "X-Acto" knife and that she was feeling "stressed" about mother. She told the interviewer that she felt mother favored

MI over her and that mother sometimes told her that she was stupid. She denied that stepfather had ever touched her inappropriately.

MI also told the CARES interviewer about the incident with stepfather. She said that one day, around the time that she was in the fourth grade, she was lying on the couch watching television with stepfather, who was sitting on the couch at her feet. She thought mother and the other children were at the grocery store. MI related that stepfather had been rubbing her back with his hand when he moved his hand under her shirt and began rubbing her stomach. She said (and demonstrated using dolls) that his hand then slid down inside the front of her pants, under her underwear, touching the top of her vaginal area. He then pulled his hand out of her underwear and put it over her underwear between her legs, rubbing her front private area. MI was confused and scared, and she got up and went to her room. She looked in her "feelings book" to identify how she was feeling and then began writing in her journal her thoughts about what had happened. The journal later disappeared. Stepfather came into her room while she was writing in her journal and asked if she was okay. She said that she was, and he left. She told MA the next day about what stepfather had done, but MA did not react. MI did not tell anyone else, and she indicated that stepfather had never touched her inappropriately again. MI said that she had recently told MA again about the incident[3] but had told her not to tell anyone because it had been over three years since it had occurred. A physical examination performed at CARES revealed no physical evidence of sexual abuse of either girl.

DHS filed dependency petitions for all six of mother's children on March 8, 2011.[4] The operative petitions[5] allege

---

[3] That occurred when the twins were sharing secrets—MA confided to MI that she had been cutting herself, and MI told MA about the incident with stepfather.

[4] The petitions were heard together, and the court eventually took jurisdiction over all of the children. This appeal involves only MA and MI; the other four children are the subject of a separate appeal, also decided this date. *Dept. of Human Services v. M. E. (A150361)*, 255 Or App 381, 298 P3d 1227 (2013).

[5] We refer to the petitions as they were amended to conform to the evidence at trial.

that MA and MI are within the jurisdiction of the court under ORS 419B.100(1)(c) based on the following conditions and circumstances:

"A.   [Stepfather] sexually abused [MI] several years ago. The mother does not believe that the sexual abuse occurred and does not believe that [stepfather] poses a threat of harm to her children. This circumstance places all the children under a current threat of harm.

"B.   The mother has made negative comments directly and indirectly to [MA] that created a risk of serious loss or injury to [MA's] emotional and physical well being.

"C.   [Father] is the legal father of [MI and MA]. He was married to the mother at the time of [MI and MA's] birth.

"D.   The father is unable to legally protect [MI and MA] due to the custody order allowing unsupervised visitation with the mother and requires the assistance of DHS to monitor the mother's contact with [MI and MA]. This circumstance poses a current threat of harm to [MI and MA's] emotional and physical well being."

Before the jurisdictional hearing, Dr. Colistro, a forensic/investigative psychologist and certified clinical sex-offender therapist, performed a psychological evaluation and psychosexual risk assessment of stepfather. The results of his psychological testing supported the presence of a social anxiety disorder, which was consistent with what stepfather reported. Stepfather's "psychosexual profile as it pertains to sexual violence risk * * * indicate[d] an absence of criminogenic factors." Colistro stated, "[I]t is safe to conclude that [stepfather] is in no way criminally oriented." Colistro's report summarized the results of his evaluation, in part, as follows:

"In summary, results of this psychologic evaluation and psychosexual risk assessment, which has taken into account documentation from law enforcement, DHS, CARES NW and others, and which has subjected these data to quantitative and qualitative psychosexual risk assessment protocols, fail to support the hypothesis that [stepfather] poses any significant threat for committing a person-to-person crime in general or a sex crime in particular. A sexual person-to-person crime is particularly unlikely given [stepfather's] intensely felt moral values and the fact that his social

anxiety is at its highest in the context of close interpersonal relations."

After DHS received Colistro's report, stepfather was allowed to return to the home with mother and their other children.

However, the twins continued to stay with father and have only supervised visits with mother. After the twins' first visit with mother, both girls came home crying. They told their caseworker that they felt that mother was targeting MA by saying things to make her feel bad. In mid-March, MA was taken from school to the emergency room because of concerns about "suicidal ideation."[6]

The jurisdictional hearing was held over 10 days between June 13 and November 15, 2011. The court heard testimony from MA and MI, mother, father, DHS workers, the CARES examiner, school personnel, a police officer, psychologists, and various family members and friends.

MI's testimony at the hearing was consistent with what she had told the CARES interviewer about the incident with stepfather, except that, at the hearing, MI testified that stepfather had touched her vaginal area on top of her underwear, rather than under it. A video recording of the CARES interview of MI was also admitted into evidence and played for the court.

MA also testified consistently with her previous disclosures. She explained that mother "sometimes blames me for things or gets upset with me because I'm like my dad or something like that" and that mother has called her a "brat or stupid or something like that."

Mother testified that she did not believe that the abuse had occurred. She said that, when she first heard the allegations about stepfather from the school staff, she found it "less than ten percent" believable and, as the investigation proceeded, she had "zero percent" belief that the incident ever occurred. She testified that she did not believe it had happened because MA "had just been lying about other things for no reason," some of the details of MI's story did

---

[6] The record does not disclose the details of that event, and it does not appear that MA was admitted to the hospital.

not reflect reality,[7] and she never left MI or MA alone with stepfather in a one-on-one situation. Regarding the latter point, she explained that she had instituted a "rule of three" policy—meaning that she "did not leave [MA or MI] in a one-on-one situation with any adult male"—even before she was married to stepfather, because, after her contentious divorce from father, she did not "want him to be able to accuse anybody of doing anything to my twins." With respect to MI, mother testified that she did not believe her because "[MI] is a people pleaser and I believe that she is doing what she has always done, which is trying to please her father."

Both mother and father testified that they were unaware that MA had been cutting herself until the week of the school meeting in February 2011, when MA admitted to that behavior. Mother testified that it was not until then that she had any indication that MA was suffering any emotional distress. Up until that time, mother "felt like [MA] was handling her life pretty well and that, you know, she was pretty—a pretty well-accomplished child and she seemed very confident." Father also testified that "[i]t was a shock" to learn about MA cutting herself. Neither parent had noticed any physical signs of that behavior.

Colistro testified as to his evaluation of stepfather, explaining that it was

> "[i]t was a general psychological psychosexual risk assessment, so the question in general is: Are there any aspects [of] this individual psychologically that are significant vis-a-vis him posing any sort of threat relative to a person[-] to[-]person crime to his family or to anyone and, specifically, a person[-]to[-]person crime of a sexual nature?"

Colistro noted that he was unable to administer certain test instruments because those instruments are standardized based on convicted offenders or people who have been formally charged with sexual offenses, neither of which describe

---

[7] For example, mother was told that the incident had occurred "on our old couch in our new house," but, according to mother, the old couch was never in their new house. Similarly, the television was never on the floor, as MI had indicated, but on a stand. And, mother testified that, because her two-year-old son is autistic and difficult to handle in public, it was extremely unlikely that she would have taken him to the grocery store without stepfather. She also testified that, contrary to MI's testimony, she did not have a regular pattern of grocery shopping on a certain day.

stepfather. He also acknowledged that, had stepfather admitted to touching MI in the way that she alleged, his testing results and conclusions would have changed "drastically."

On direct examination, Colistro was asked whether, in his opinion, stepfather posed a risk of threat or harm to his own biological children; he responded, "He poses no risk." However, on cross-examination by counsel for father, the following additional colloquy took place:

"Q.  Dr. Colistro, have you made a specific recommendation as to whether [stepfather] is a potential threat to his nonbiological children, [MA and MI]?

"A.  No, I've made a general conclusion about him posing a threat to anybody.

"Q.  To anybody. But you didn't make it specific as to [MA and MI] where the allegation actually—there's an allegation of sexual touching of [MA and MI] and I'm asking you, have you reached a—a conclusion or do you have an opinion on whether he poses a threat of harm to [MA and MI]?

"A.  I see no basis on my findings, based on my findings to restrict his contact with them relative to concerns about sexual deviance. I would have concerns about his contact with them relative to relationship issues that were addressed in the DHS documentation and which he talked about as well."[8]

Dr. Zorich, a psychologist who had conducted a psychological evaluation of mother, also testified at the hearing. She noted that mother was "very bright" and had no Axis I or II diagnoses; in her report, she concluded that, "[c]urrently, there is no psychiatric condition or symptoms that would impair [mother's] functioning as a parent." She also explained the following:

---

[8]  Colistro went on to explain that "[t]he concerns are that his relationship with them exists in the context of a fractious relationship between their mother and father and that that issue, by my understanding, really has never been addressed, that that animosity has never really been dealt with or ameliorated and that's problematic."

"Determining if [stepfather] sexually abused [MI] is beyond the scope of this evaluation. The allegations are certainly plausible and [mother] presents a plausible alternative explanation based on the familial history. [Mother] is a critical thinker and her intelligence has led her to believe that she is usually right in her assessment of situations. On interview, she presented clear reasons why she questioned the allegations and provided specific reasoning why she could be 'certain' that the abuse didn't occur. That being said, a safety plan is rarely failsafe, particularly if one has little cause to actually perceive danger. [Mother] was clear that[,] if it was determined that [stepfather] had sexually abused [MI], she would divorce him."

Zorich testified that "[i]t's very clear" that mother is "willing to protect her children and her husband," and to "put into place whatever safety measures she needs to." Zorich related that mother volunteered to put cameras in her home and was "willing to go the extra mile to make sure that there is no possibility of something like this happening again." Zorich also opined that mother was capable of being protective even if she did not believe that the touching had occurred.

According to Zorich, mother expressed love for both twins but acknowledged that she had a more difficult relationship with MA than with MI. Zorich observed that mother's relationship with MA "has been ruptured and it will be challenging to restore it from both sides." Zorich recommended that mother receive individual counseling to "address issues of distrust with the kids." She thought it important that there be a "supervision component" during visits with the twins as therapy was getting underway but, otherwise, expressed no concerns about them being in mother's care.

At the conclusion of the hearing, mother moved to dismiss the petition, asserting that the state had failed to prove that that there is a current risk of harm to MA and MI. The juvenile court denied the motion and found that the state had proved the allegations in the petitions. It made the following oral findings in support of that ruling.

First, the court found, by a preponderance of the evidence, that MI had been sexually abused by stepfather. It also found that it was a one-time incident. In doing so, the court relied heavily on its assessment of MI's credibility. The court found that MI's testimony was "extremely credible," emphasizing her consistency over time in relating what had occurred. The court observed, "There were no embellishments as time went on. There was no recanting and that's unusual in these cases for a basically consistent story to be told." The court also noted that MI had "kept quiet to keep people happy as opposed to telling people to make people happy."

Next, the court also found that mother "absolutely" did not believe that the abuse happened; rather, "mom's whole approach * * * is that [MA] was a liar," and that "mom felt from the beginning of these allegations that her children need[ed] to prove these happened." The court also found that MA is aware that mother does not believe her and that that has affected their relationship, which was already strained. The court observed:

> "[MA] said the stress of her mother's attitude was affecting her. MA testified that the cutting was about mom. That when the cutting issues and cancer allegations came out, that her impression was mom didn't think she [referring, presumably, to mother] had anything to do with it. That it wasn't something stemming from her or her actions."

The court found that mother was not "dishonest in any of her testimony" but that she "testified from a particular focus"; the court observed, consistent with Zorich's testimony, that mother is "extremely bright, but yet the focus becomes on one focus to the exclusion of other possibilities." The court concluded that "the girls are hurt by this. It is clear that mom truly—it comes off that mom has put [stepfather ahead] of the girls[.]"

The above-stated findings of the juvenile court are supported by evidence in the record, and we accept them. However, in explaining its ruling, the court further stated:

> "The fact that [stepfather] was found not a risk of harm under the risk assessment to his own children does not

make him not a risk to other children. That question was kind of very narrowly answered by Dr. Colistro."[9]

That finding cannot be reconciled with the evidence, and we decline to adopt it. As detailed above, when asked whether, in his professional opinion, stepfather poses a threat of harm to MA and MI, Colistro testified: "I see no basis * * * based on my findings to restrict his contact with them relative to concerns about sexual deviance." Similarly, Colistro concluded in his written report that the results of his psychological evaluation and psychosexual risk assessment of stepfather "fail to support the hypothesis that [stepfather] poses any significant threat for committing a person-to-person crime in general or a sex crime in particular" and that "[a] sexual person-to-person crime is particularly unlikely[.]" In short, there is no evidence in the record indicating that, as the trial court found, Colistro had distinguished between the risk that stepfather poses to his biological children and the risk that he presents to his stepchildren. Rather, Colistro concluded that stepfather did not present a risk of sexual deviance to any person, *including* his stepchildren.

Given the trial court's error in that regard, and for the reasons expressed previously, 255 Or App at 298-99, we engage in *de novo* review and, pursuant to that review, determine that the evidence is insufficient to support jurisdiction under ORS 419B.100(1)(c).

ORS 419B.100(1)(c) grants the court "exclusive original jurisdiction" in a case involving a child "[w]hose condition or circumstances are such as to endanger the welfare of the person or of others." Under the relevant case law,

"a child's 'condition or circumstances' warrant the protection of juvenile court jurisdiction when, 'under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child.' *State ex rel Juv. Dept. v. Vanbuskirk*, 202 Or App 401, 405, 122 P3d 116 (2005) (citing *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993))."

---

[9] Moreover, at disposition, which took place immediately after the court announced its ruling, the court ordered a further psychosexual examination of stepfather "to really address the question of whether or not [he] is a threat to other children outside of just his own, given that he is a stepdad to other children." That further supports our conclusion that the court misapprehended the evidence.

*State v. S. T. S.*, 236 Or App 646, 654, 238 P3d 53 (2010). The focus is on the child's current conditions and circumstances and not on some point in the past. *Id*. Thus, as we recently summarized,

> "[t]o endanger the child's welfare, the condition or circumstances must create a current 'threat of serious loss or injury to the child' and 'there must be a reasonable likelihood that the threat will be realized.' *Dept. of Human Services v. A. F.*, 243 Or App 379, 386, 259 P3d 957 (2011); *Dept. of Human Services v. D. M.*, 248 Or App 683, 686, 275 P3d 971 (2012) (formulations in *Smith* and *A. F.* 'complement each other and correctly state the standard' for juvenile court jurisdiction under ORS 419B.100(1)(c)). The burden is on the state to prove facts sufficient to warrant jurisdiction. *Dept. of Human Services v. B. L. J.*, 246 Or App 767, 773, 268 P3d 696 (2011)."

*Dept. of Human Services v. S. P.*, 249 Or App 76, 84, 275 P3d 979 (2012).

Here, the court concluded that the girls' welfare was endangered based on the circumstances alleged in paragraph A of the petitions—that stepfather had sexually abused MI several years ago and mother did not believe that it happened or that stepfather was a threat to the girls—and that father was unable to protect the girls because of the custody order. Necessarily implicit in that conclusion is the court's finding that stepfather continues to pose a threat of sexual abuse to MI and MA and that mother will not take steps to prevent that harm because she does not believe that it exists.

There can be no question that the threat of sexual abuse to a child is a "threat of serious loss or injury"; the issue is whether the state proved that the circumstances here present a current threat of that harm—and one that is reasonably likely to be realized. *A. F.*, 243 Or App at 386. Mother argues that it did not, given that the prior abuse occurred four years earlier; it was a one-time incident; stepfather has been determined not to present a current risk for sexual abuse of the children; and mother has agreed to protective measures. The state remonstrates that there is a reasonable likelihood of harm to the twins' welfare because, "[a]t the time of the jurisdictional trial, mother

did not believe that [stepfather had] sexually abused [MI], [stepfather] was residing in the family home, mother and father had joint custody of the twins, and mother had a strained relationship with the twins, especially [MA]."

Even assuming that stepfather—who has never been charged with or convicted of a sexual offense—can be considered a "sex offender," we have held that, generally, "a person's status as a sex offender does not *per se* create a risk of harm to a child." *Dept. of Human Services v. G. J. R.*, 254 Or App 436, 445, 295 P3d 672 (2013) (citing *State ex rel Dept. of Human Services v. N. S.*, 229 Or App 151, 157-58, 211 P3d 293 (2009)). Nor is there a "presumption that a party's status as an 'untreated' sex offender presents a safety risk to a child." *Id.* (citing *B. B.*, 248 Or App at 727).

In *G. J. R.*, we considered whether the circumstances of the father's convictions for sexual offenses—specifically, three convictions for public indecency involving masturbating in public, one of which took place at a school-owned field—and his failure to complete sex-offender treatment, provided a legally sufficient basis for concluding that there was a current risk of harm to his child, Z. We held that they did not, noting that there was "no evidence that father had reoffended in the 10 years since his last conviction and no evidence from which a reasonable factfinder could find that Z fits within the class of father's victims." 254 Or App at 445. There was also a lack of evidence that the father's failure to complete treatment would give rise to a current risk of reoffending. *Id.* Thus, we concluded, there was an insufficient "nexus" between the circumstances and a risk of harm to Z. *Id.*

*B. B.* is also instructive. In that case, DHS alleged that the children were endangered based on the father's history of sexual conduct with minors,[10] which was "unremediated," the father's failure to complete sex-offender treatment, and the mother's failure to protect the children from the father. 248 Or App at 722, 729. We held that

[10] That history was considerable: the father had admitted to orally sodomizing a one-year-old girl and orally and anally sodomizing a four-year-old boy when he was 11 or 12, orally sodomizing a three-year-old girl when he was 21, and viewing child pornography in 1998. *B. B.*, 248 Or App at 719-20.

those circumstances were insufficient to establish that the children were presently endangered, when there was no evidence that the father had ever sexually abused his children (or even been suspected of having done so) or that he had had inappropriate sexual contact with any other children in the 16 years before the jurisdictional hearing. *Id.* at 723. Moreover, testimony from the father's previous sex-offender treatment specialist indicated that "father could have made changes in his life during the 11 years following father's last treatment * * * so as not to 'recommit these types of offenses,'" and the testimony of the father's former probation officer also did not provide a basis for finding that the father's behavior or condition was "unremediated." *Id.* at 725.

Here, the "nexus" between stepfather's prior conduct and a potential risk to MI and MA is clearly more pronounced than in either *G. J. R.* or *B. B.* Not only are the twins in the same *class* of victims as stepfather's prior conduct, one of them *is* the same victim, a fact that we do not, by any means, intend to minimize. And, the time that has elapsed between stepfather's sexual conduct and the jurisdictional decision is not nearly as lengthy as in *G. J. R.* or *B. B.*

Nonetheless, it has been approximately four years since the abuse occurred, and the court expressly found that it was a one-time incident. That finding is amply supported by the record. There is no hint in the record that there has been any sexual behavior by stepfather toward MI since the one incident, even though the incident of abuse was not disclosed and, consequently, there was no intervention. MI consistently denied that stepfather had acted inappropriately with her at any time after the single incident. She told the CARES interviewer that it was "awkward" between them at first, but "everything is fine now." There also is no evidence that stepfather has ever touched MA inappropriately.

Moreover, Colistro was quite definite in his opinion that stepfather presented no risk of sexual harm to MA and MI, particularly given his social-anxiety disorder.[11]

---

[11] Although the court recognized that there were some limitations inherent in Colistro's assessment of stepfather, it nonetheless found him credible.

He wrote, "A sexual person-to-person crime is particularly unlikely given [stepfather's] intensely felt moral values and the fact that his social anxiety is at its highest in the context of close interpersonal relations."

In addition, Zorich, whom the trial court also found credible, opined that mother was capable of being protective even if she did not believe that the abuse had occurred. Indeed, although mother did not believe MA's disclosure about stepfather, she immediately agreed to a voluntary protection plan so that the twins would not be in his presence. In particular, she agreed that stepfather would leave the home, that MA and MI would stay with father, and that she would have only supervised visits with them. Mother also requested counseling for the twins as soon as she learned about MA's disclosure. Zorich testified that mother was willing to put into place whatever safety measures were needed to protect her children, including putting cameras in her home. In addition, mother had a policy—the "rule of three"—to never let one of the twins be alone in a room with an adult male. Although there was conflicting testimony regarding whether mother consistently applied that policy with regard to stepfather, there is no reason to doubt that she will do so in the future.

Given the totality of those circumstances, we are not persuaded that the evidence is sufficient to establish, by a preponderance of the evidence, that stepfather's four-year-old abuse of MI and mother's denial of that abuse present a current risk of harm to MI and MA. *See Dept. of Human Services v. M. Q.*, 253 Or App 776, 787, 292 P3d 616 (2012) ("Jurisdiction cannot be based on speculation that a parent's past problems persist at the time of the jurisdictional hearing in the absence of any evidence that the risk, in fact, remains."); *cf. State ex rel Juv. Dept. v. T. S.*, 214 Or App 184, 193, 164 P3d 308, *rev den*, 343 Or 363 (2007) (reasonable likelihood of harm to the child's welfare established where the totality of the circumstances included numerous incidents of sexual abuse of the child by the father over a period of several years, past claims that the father had sexually abused two of his other children, father's writing of a fictional account that described in

graphic detail a father raping his young daughter, which was similar to the sexual abuse claims of the child, and the mother's hostility toward, and "unwillingness to be vigilant in her protection" of, the child).

That is the end of the matter as it concerns MI. However, because we must evaluate "whether the allegations in the petition are *collectively* sufficient, if proven, to establish jurisdiction," *State v. R. H.*, 237 Or App 245, 251, 239 P3d 505, *rev den*, 349 Or 480 (2010) (emphasis in original), we must also evaluate whether the court's additional finding with respect to MA is sufficient—either alone or when considered in conjunction with the allegations discussed above—to warrant jurisdiction under ORS 419B.100(1)(c). We turn to that question.

The court found that the state proved the allegations in paragraph B of the petition, that is, that mother's direct and indirect "negative comments" to MA have "created a risk of serious loss or injury to [MA's] emotional and physical well being." The court did not separately explain that finding (nor did either party separately address it); however, the court, in explaining its ruling generally, stated that "mom's whole approach is that [MA] was a liar" and that MA "[is] aware that mom doesn't believe her." The court also noted that MA had testified that "the stress of her mother's attitude was affecting her" and that "the cutting was about mom." Thus, by "negative comments," we understand the court to be referring both to comments made by mother to the effect that she did not believe that the abuse occurred and was upset with MA for disclosing it and—because the "cutting" behavior preceded the abuse disclosure—comments that MA understood as meaning that mother favored MI and did not like her and that mother had occasionally called her a "brat" or "stupid."

That said, the facts do not support that MA was at risk of "serious loss or injury" as a result of those comments. First, the state failed to present any evidence as to the nature of the physical or emotional injury that MA was reasonably likely to suffer because of mother's negative comments. Although it is true that the harm may be self-evident in some circumstances, that is not the case here.

Although there was some evidence that MA had begun cutting herself because of "stress" due to her relationship with mother, the extent of that behavior is undisclosed in the record. It also appears that no one—least of all mother—was aware of it until the week of the meeting at the school. In fact, there is no evidence in the record that mother knew that MA was having any emotional difficulties until she learned from the school about the fabricated cancer story. And, most importantly, once mother learned about MA's actions, she responded appropriately—immediately requesting that MA receive counseling and agreeing to have only supervised visits with MA until the situation could be assessed. Although Zorich concluded that mother's relationship with MA "has been ruptured and it will be challenging to restore it from both sides"—a fact that mother recognized—and suggested counseling and supervised visits as that process initially got underway, she expressed no concerns about MA being in mother's care. In short, although the record supports a finding that mother's parenting of MA has not been ideal, it does not support a conclusion that, under the totality of the circumstances, MA's welfare is presently endangered. *See A. F.*, 243 Or App at 387 ("The fact that a parent engages in behavior that could negatively affect his or her parenting does not necessarily mean that the behavior can serve as a basis for juvenile court jurisdiction over a child."); *id.* at 386 (state failed to present any evidence that exposure to child pornography would harm the affected children "in a way and to a degree" that would justify jurisdiction); *State ex rel Dept. of Human Services v. D. T. C.*, 231 Or App 544, 554-55, 219 P3d 610 (2009) (insufficient evidence that the father's condition—an untreated alcohol-abuse problem that sometimes made him "mean" or "controlling" and that frightened the children—created a reasonable likelihood of harm to the children in the past or at the time of the hearing); *see also Dept. of Human Services v. C. Z.*, 236 Or App 436, 236 P3d 791 (2010) (jurisdiction not warranted where state failed to prove nexus between the mother's chemical-abuse problem and a risk to her children).

Reversed.